[Nos. 6660 and 6661.]

O'Connor, Secretary of State, v. Smithers.
O'Connor, Secretary of State, v. Lawson.

1. **Elections—Failure to Accept Nomination**—No convention or body of men can compel another to be a candidate for office against his will. The statute regulating elections providing that every person nominated by certificate should, within five days thereafter, file a written acceptance of the nomination, failure to be deemed a declination (Laws 1891, 148, 3 Mills' Stats., § 1625n), the failure of the nominee to file his acceptance within the prescribed period leaves the ticket vacant as to the office for which he was nominated, even though he has already accepted a nomination for the same office upon another ticket, and the Secretary of State is justified in refusing to certify it for a place on the ballot.—(27, 28)

2. **Elections—Nomination by Certificate**—The statute allowing nominations for office by certificate of a prescribed number of voters providing that no person shall sign more than one certificate of nomination for any office, two certificates nominating the same persons for the same offices respectively were subscribed in part by the same individual electors, and presented at the same time to the Secretary of State. It was held that the signatures so duplicated must be rejected from consideration; and inasmuch as, omitting these, there was not the rea···

number of signatures, the certificate was void, and must be rejected.—(31-33)

3. **Elections — Nomination by Certificate — Amendment**—A certificate of nomination, void for want of the requisite number of signatures, cannot be amended by the filing of an additional certificate, properly subscribed, after the lapse of the time allowed for nominations by certificate.—(34)

4. **Appeals—What Judgments Will Be Reviewed**—An erroneous judgment which, though not controlling other courts of the same degree, may be cited as a precedent, and tends to confusion and controversy, will be reviewed and reversed.—(35)

5. **Judges, Disqualification of**—Members of the bench who are candidates by a party nomination for re-election, are not disqualified from sitting in a proceeding brought to test the validity of a ticket certified by individual voters, a nomination upon which they have declined. They have no personal interest in the controversy.—(35, 36)

*Appeals from Denver District Court* — Hon. GEORGE W. ALLEN, Judge.

Messrs. ELLIOTT & BARDWELL, and Mr. CHARLES W. WATERMAN, for appellant, in each case.

No appearance for appellee.

Mr. JUSTICE GABBERT delivered the opinion of the court:

These cases present the same questions for determination, and will be disposed of in one opinion.

On the second of October two certificates of nominations by individuals of candidates to be voted for at the next general election were filed with the secretary of state, one being designated ''Business'' and the other ''Anti-Guggenheim,'' as the names selected by the signers of such certificates for the respective nominations. The first was filed by the respondent Smithers as the representative of the persons making such nominations; and the second by William Lawson as the representative of those signing that certificate. Each list of candidates was the

same, and embraced nominations for presidential electors, all the state offices, candidate for congressman-at-large, and a candidate for congressman for the first district. All these candidates were the same as those named by the Republican conventions, certificates of which had theretofore been regularly filed with the secretary of state. To each of these lists of nominations were attached certificates of individuals nominating candidates for the general assembly under the respective names selected, as above stated, for the five legislative districts of which the city and county of Denver is a component part, and also nominations for the office of state senator for districts numbers one and twenty-two.

On October 5th objections were filed to all these certificates. On October 7th these objections were heard and decision rendered by the secretary of state, sustaining them and holding that the nominations were invalid, and not entitled to be printed on the official ballot. Thereupon Smithers, in the one case, and Lawson in the other, applied to the district court to have the action of the secretary of state reviewed. Upon the applications so filed an order was entered, requiring the secretary of state to answer and produce therewith all of the original certificates of nomination tendered under the names "Business" and "Anti-Guggenheim."

The secretary of state answered, so far as necessary to notice, to the effect that the certificates of nomination involved did not contain the number of names required by law; that a great number of names upon each certificate, nominating candidates for the same identical offices were the same; and that all the certificates involved were tendered at the same time. Thereafter, and during the progress of the trial, which commenced October 10th, Smithers and Lawson, respondents here, tendered the secretary of state

additional certificates containing additiona, signatures for the purpose of supplementing the original certificates. These were rejected by the secretary of state. Thereafter they presented supplemental petitions in the district court, setting forth the tender of these additional certificates, which petitions were allowed to be filed over the objection of the secretary of state, petitioner here. The evidence discloses that the persons signing the original certificates nominating the same candidates for the same identical offices, under the respective names selected, were the same to such an extent that, with the duplicate names eliminated, there was not the number upon either certificate required by law to make nominations by individuals. It also appears from the evidence that all the certificates were tendered the secretary of state at the same time.

The evidence also discloses that none of the nominees for presidential electors, state offices, or for congress had accepted the nominations. The judgment of the district court reversed the action of the secretary of state, and held that the nominations involved were valid under the law, and that he should certify them accordingly. The secretary of state brings the cases here for review.

Section 1625n, 3 Mills' Ann. Stats., Revised Supplement, is as follows:

"Every person nominated for any public office as in this act provided, shall, within five days after the filing of the certificate or nomination paper containing his nomination in the proper office, accept such nomination in a written declaration, signed and acknowledged before an officer authorized to take acknowledgments; the failure of any such nominee to so accept such nomination and file such declaration of acceptance within the time aforesaid, shall be deemed a declination, and such nomination shall be

treated as vacant, which vacancy shall be filled as provided for other vacancies herein. Two or more nominees may make and acknowledge such acceptance in one paper; provided, that any person nominated for any office by either of the two leading political parties which presented candidates at the last preceding election shall be deemed to have accepted such nomination, unless such candidates shall file with the officer having the custody of such certificates of nomination a written declination of such nomination within the said five days."

This section may also be found in the Laws of 1891, page 148, § 14; and is § 2162, at page 16 of the election laws as compiled by the secretary of state for 1908.

The statute is so plain that it needs no construction other than that which its own language imports. Nominees by either of the two leading political parties which presented candidates at the last preceding election are not required to file an acceptance. All others are, and if they do not within the time specified, their failure to do so is equivalent to an express declination, and such nominations shall be treated as vacant. A nomination by individuals is not complete until the acceptances of the nominees have been filed. If not filed within the time required by law, the certificate of nomination has no force or effect whatever. Without an express written acceptance there is just as much a vacancy as if a nominee by convention should expressly decline to accept.

At the last preceding election the two leading political parties within the state and the first congressional district were the democratic and republican. At that election no candidates for the state or for the first congressional district were presented under the name "Business" or "Anti-Guggenheim," and hence, following the plain letter of the statute

above quoted, the failure on the part of the persons named as nominees by the certificates presented to the secretary of state as candidate for congress in the first district, for the state offices, for congressman-at-large and presidential electors to accept such nominations, rendered them vacant, so far as the certificates were concerned, and necessarily, the secretary of state could not certify them for the purpose of having them placed upon the official ballots. In other words, he could not be required to certify a list of nominations which, according to the plain letter of the law, did not exist.

Counsel for respondents contend that the statute requiring candidates nominated by individuals to accept nominations does not apply for two reasons: (1) That candidates once regularly nominated cannot decline further nominations unless they decline the one already made; and (2) that voters cannot be deprived of the right to vote for whom they please. Such seems to have been the views entertained by the lower court. Manifestly these claims are without merit. The statute requiring all candidates to accept nominations except those nominated by either of the two leading political parties which presented candidates at the last preceding election contains no such exception, nor is it susceptible, from any language employed, of the construction contended for. The right to run for office or decline a nomination is purely a personal privilege. No persons or convention can compel another to be a candidate against his will, or, when regularly nominated, to decline by action directly or indirectly. The construction contended for by counsel for respondents would lead to the most absurd results, by compelling a candidate regularly nominated to appear upon the official ballot as a candidate of a party diametrically opposed in every principle to that upon which he was first nomi-

nated; or else decline to run at all. The law is not susceptible of such a construction as would bring about such incongruous results. We may well concede that electors may vote for whom they please, and that they are not bound to vote for any candidate placed upon the official ballot. That, however, is a different proposition from complying with the requirements of the law in making nominations, so that they may appear upon the official ballot. If the law has not been complied with in this respect, the name of candidates cannot be printed thereon.

So far as respondents and the persons whom they represent are concerned, they cannot successfully complain that they are deprived of the privilege of voting for the candidates under consideration. The names of these candidates will appear upon the official ballot, and respondents and the persons whom they represent can vote for them if they choose. Perhaps it may not be as convenient for them to do so as if the nominees whom they named were designated on the official ballot under the party names which they selected, but it would be impossible to prepare an official ballot unless the law prescribed what steps must be taken in order to have a list of nominations appear thereon. A mere inconvenience of electors cannot be considered in determining whether or not such steps have been taken.

*People v. Kaiser,* 11 N. Y. Supp. 849, is cited by counsel for respondents as authority for the proposition that it was not necessary for the candidates nominated by the certificates who had already been nominated by the republican state and congressional conventions to file a written acceptance of such nominations. The case is not in point. In New York there appears to be a special statute relating to independent nominations, whereby, under certain conditions, candidates already nominated by a political

party may be nominated by an independent organization, but the names thus selected must be chosen from the nominees previously regularly nominated according to law, and it was held that candidates so nominated were not required to signify acceptance of the nomination made in this particular manner, because of the provisions of the statute specifying how such nominations might be made. We have no such statute; consequently, the language in the opinion upon which counsel rely has no application.

Counsel for respondents also cite *Murphy v. Curry,* 70 Pac. 461, in support of their claim that those signing the certificates nominating candidates for the offices under consideration, by naming those already nominated according to law, have the right to have them designated under the respective names selected without such nominees' acceptance, otherwise the right of the exercise of suffrage by electors is impaired. The court there had under consideration a provision of the statute relating to official election ballots, which provided that the name of a candidate should be printed only once upon the ballot, and if any candidate was nominated by more than one certificate of nomination, it was incumbent upon him to choose which of the party designations he desired to have his name printed under, and it was held that the act was unconstitutional as interfering with the rights of political parties to make nominations, and with the right of a candidate to demand that his name should be placed on the official ballot so as to inform the voters that he is the nominee of a particular party. No such questions are involved in the case at bar. It does not present the question of whether or not a candidate is entitled to appear upon the official ballot as the nominee of two or more parties. We have no statute inhibiting nominations to be made in this way, but if we had, the question of its

validity or the suggestion that such a statute impaired the right of suffrage could not be raised until it appeared that nominations presenting the question had been made. In the case at bar the candidates named by the certificates never became nominees for the reasons we have already given.

The evidence discloses that the names on the certificates designated "Business" and "Anti-Guggenheim" nominating candidates for the legislative and senatorial offices for the same identical offices have been duplicated, so that there are not one hundred names on either of these certificates nominating candidates for these offices unless the duplicates are counted. To illustrate—the "Business" legislative certificate for the counties of Denver, Adams and Arapahoe contains 115 names. On the "Anti-Guggenheim" certificate for the same district and same offices there are also 115 names; but we find, on examination, that not less than forty-six names are the same upon each certificate; so that, eliminating the names duplicated, there are but sixty-nine upon each certificate. The number of names attached to the certificates nominating candidates for the other legislative and senatorial districts for the same identical offices, under the two names adopted, vary in number, each having more than a hundred; but with the duplicates eliminated, one hundred different persons have not signed each certificate for the same office. The law provides that a nomination other than by convention, for an office to be filled by the voters of a district, less than the state and greater than a county, must be by certificate containing at least a hundred names.—§ 1625f, 3 Mills' Ann. Stats., R. S.; § 6, Laws 1891, p. 144; § 2154, p. 12, Election Laws, as compiled for 1908.

Each of the legislative and senatorial districts involved embraces more than one county.

The law further provides: "No person shall sign more than one certificate of nomination for any office."—§ 1625g, 3 Mills' Ann. Stats., R. S.; § 7, Laws 1891, p. 145; Election Laws, as compiled for 1908, p. 13, § 2155.

The purpose of this provision is to prevent the same persons nominating candidates for the same office by certificate as individuals under two or more party names. An elector once having exercised the right to join in a certificate as an individual, nominating a candidate for office under some name adopted by the signers, cannot join in nominating the same person for the same office under some other name. Having exercised the right once, he is precluded from exercising it again under such circumstances. The purpose of the statute in allowing nominations by individuals was to confer upon electors the right to place candidates in nomination under some party name which they might choose, representing a principle which they desired to support at the polls; but it was never intended (and, in fact, is inhibited by the statute last above referred to) that they could exercise this right indefinitely, by duplicating the nomination of candidates for the same offices, to be voted for at the same election, under different names. If the rule were otherwise, the official ballot could be made to contain the names of the different parties under which a candidate had been nominated to an extent which would render it more confusing and unintelligible than it now is, when all the protection which the law affords against such conditions is enforced. In short, the law is, that an elector having once joined in nominating a candidate by a certificate of individuals, cannot, thereafter, join in nominating that same candidate in the same way for the same office, under another party name, to be voted for at the same election, for the reason that having once

exercised the right of choice of candidates and principle, so far as nominations are concerned, he cannot exercise it again. Authorities sustaining this conclusion are, *In re Smith,* 85 N. Y. Supp. 14; *Phillips v. Curtis,* 38 Pac. 405; *Southall v. Griffith,* 37 S. W. 577.

From this conclusion it is apparent that the certificates nominating candidates for the legislative and senatorial districts did not contain the requisite number of names to make a nomination by individuals, for the obvious reason that all duplicate names on these certificates for the same candidates for the same office must be eliminated. Hence, they were invalid. —*Southall v. Griffith, supra; State v. Lesueur,* 38 S. W.. 325; *In re Official Ballot,* 109 N. W. 1; *In re Horan,* 95 N. Y. Supp. 607.

During the trial counsel for respondents sought to cure the defects in the certificates filed with the secretary of state by tendering to him additional certificates containing additional signatures, for the purpose of supplementing the original certificates, which were refused. Thereafter supplemental petitions were filed in the district court setting forth the tender of these additional certificates. These supplemental petitions were allowed to be filed, and the additional certificates appear to have been regarded by the trial judge as curing the defects in the originals, and treated as sufficient to make up the requisite number of names to make nominations by individuals. The law provides that

"* * * Certificates of nomination otherwise than by a convention or a committee made according to the provisions of section 6 of this act shall, when required to be filed with the secretary of state, be filed not more than forty nor less than thirty days before election. * * *"—§ 1625i, 3 Mills' Ann.

Stats., R. S.; Laws 1891, p. 146, § 9; Compilation of Election Laws, 1908, p. 13, § 2157.

The law further provides that objections to certificates of nomination made before ministerial officers and sustained, "*   *   * may be remedied or defect cured upon the original certificate, or by an amendment thereto, or by filing a new certificate within three days after such objection is sustained." —§ 1625m, 3 Mills' Ann. Stats., R. S.; Laws 1897, p. 154, § 1; Compilation of Election Laws 1908, p. 15, § 2161. Under this provision counsel for respondents contend that the secretary of state should have received and filed the additional certificates and that the district court was correct in deciding that they cured the defects in the original certificates as filed with the secretary of state. What particular amendments to certificates of nomination or defects therein may be cured under the provision of the law last above quoted, it is not necessary to determine in detail. They do not, however, contemplate that certificates of nomination which are absolutely void, can be cured or amended so as to make them valid after the time for filing such certificates of nomination has expired. When the amendments were tendered to the secretary of state, the time for nominating candidates for the offices under consideration had terminated. The original certificates were void, because they did not contain the requisite number of names of persons entitled to sign such certificates, therefore they could not be amended by additional names after the time for making nominations in the manner attempted had gone by. The original certificates had no more validity than if they had contained but one name, when the statute requires that each must contain at least one hundred names; consequently, they had no more force or effect to nominate candidates than if they had never been filed, and could only have

been made valid by the addition of names within the time required by law to make nominations by individuals.—*Whipple v. Kleckner,* 25 Colo. 423.

Counsel for respondents also contend that in the exercise of the discretion vested in this court it should not undertake to review the judgment of the trial court, because no wrong has been committed which it is necessary to redress, even if that judgment is not right. The judgment of the district court, while not controlling, is, until reversed, at least persuasive as an authority for other *nisi prius* courts to follow, and if it stands, is a precedent justifying the attempt to make nominations in the way attempted by respondents and those whom they represent, and to insist that such nominations go upon the official ballot. That judgment is so clearly wrong and subversive of the spirit and intent of the law relating to nominations by individuals, and will tend to create confusion and controversy so long as it is permitted to stand to such an extent, that, in order to prevent such confusion and controversies in the future, this court, for this reason alone, if no other existed, should review the judgment, and determine what the law is on the questions involved.

When these cases were presented to this court they were heard by four of the justices. Justices Helm, Goddard and Maxwell did not participate in the first instance, because they are candidates to be voted for at the next election. The four justices were unable to agree and no order was then made. Later, application was made by the petitioner to have the cases heard before the full court, and orders were at that time entered, the purpose of which was to preserve the *status quo* until the cases could be finally disposed of. On the hearing before the full court, respondents objected to Justices Helm, Goddard and Maxwell participating because of the fact that they

were candidates on the tickets in question. This objection had no merit whatever. In order to make nominations by individuals two things are necessary: (1) The filing of a certificate with the proper officer substantially in the form required by law containing the requisite number of signatures of persons entitled to sign; and (2) an acceptance on the part of the candidates so named. Unless the latter accept, they are not nominees, and are no more candidates, or affected by the certificates filed, than if none had ever been filed. As above stated, the justices named never accepted the nominations which the persons filing the certificates with the secretary of state undertook to make; consequently, they were not candidates by virtue of any act of the persons signing such certificates, were not affected in the slightest degree by such certificates, and had no more interest in the result of this litigation than any other citizen.

In support of the motion above referred to, an affidavit was filed, setting forth that about the time of the filing of the certificates of nomination involved, a meeting of the candidates of the republican party for state and congressional offices was held in the city of Denver, at which meeting these candidates resolved that they would not accept the nomination upon any other than the tickets of the republican party. We cannot see how this disqualified any of the justices of this court from participating in the decision of these cases. It was their undoubted personal privilege to determine for themselves whether they would accept any other nomination than that made by the republican party. By exercising this privilege they were not disqualified from participating in the decision of these cases, or made personally interested in the result. It seems to be further intimated, in the affidavit in question, that the purpose

of the candidates of the republican party in conclud-
ing that they would not accept a nomination upon
any other ticket was to prevent the printing of the
"Business" and "Anti-Guggenheim" tickets.     If
such was the purpose, we do not see how it is possible
to conclude that such candidates, or the justices of
this court, who may have participated in the meeting
referred to, became personally interested, so far as
the "Business" and "Anti-Guggenheim" tickets are
concerned.     These tickets could not be printed upon
the official ballot unless the candidates named did
accept; and such candidates, by agreeing not to ac-
cept such nominations, brought about no result dif-
ferent from that which would have resulted had they
taken no action at all, so far as their own candidacy
was concerned.

Before leaving this subject we ought to suggest:
That by counter-affidavit the justices mentioned
show that the action of the candidates just considered
was taken ten days before the filing of the two tickets
in question, and without any knowledge that such
steps were even under consideration.

To briefly recapitulate—the principal questions
determined, as presented by the record, are:

(1) That nominees named by certificates of in-
dividuals do not become such unless they accept the
nomination so tendered.

None of the nominees for presidential electors,
congress, or state offices accepted, therefore the per-
sons named by respondents as candidates for the
above offices could not appear upon the official ballot
under the names selected for the respective tickets
involved.

(2) That persons having joined in making a
nomination by certificate as individuals are precluded
from nominating the same nominees in the same way

under another name for the same office, to be voted for at the same election.

The testimony establishes, without dispute, that the certificates nominating candidates for the five legislative districts embracing the city and county of Denver, and for senatorial districts 1 and 22, under the respective names selected by respondents, contained duplicate names of signers for the same identical offices in such numbers that none of these certificates, when the duplicate names were eliminated, contained the requisite number required by law; therefore, these certificates were invalid.

(3) That certificates by individuals making nominations cannot be amended by the addition of further signatures after the time for filing such certificates with the proper officer has expired.

The attempt to remedy the defect in the certificates in question by the tender of additional signatures was not made until after the time for making nominations by individuals had expired; consequently, these additional signatures could not be received or considered.

(4) That persons named as nominees in a certificate by individuals have no personal interest in such nominations unless they have accepted.

Justices Helm, Goddard and Maxwell never accepted the nominations attempted to be made by respondents; therefore, they had no more personal interest therein than any other citizen, or than if the certificates had never been filed.

The judgment of the district court is reversed and judgment will be rendered in this court, in accordance with the views expressed in this opinion.

*Reversed and judgment rendered.*

Decision *en banc.*

CHIEF JUSTICE STEELE and Mr. JUSTICE BAILEY dissent.

Mr. Justice Helm concurring.

I concur most cordially in the argument and con-
clusion of Mr. Justice Gabbert upon the controlling
question involved in this controversy, and in the
resulting reversal of the judgment below. I desire,
however, for reasons that will later appear, to submit
a few additional suggestions.

Judge Gabbert has demonstrated beyond a rea-
sonable doubt the fact that § 2162, Mills' Ann. Stats.,
means what it says. And that the failure of the
national and state candidates, named on the two tick-
ets in controversy, to accept the nominations within
the statutory period, resulted in removing them as
such candidates and leaving vacancies upon those
tickets.

The industry and research of counsel for re-
spondents failed to discover a single authority an-
nouncing or intending to announce a conflicting view.
The case of *People v. Kaiser,* 11 N. Y. Supp., cited
by them, is, as demonstrated in the principal opinion,
based upon a wholly different statute. That court,
which is not a court of last resort, is not interpreting
a statute similar to the one under consideration here.
So far as we are advised, New York has no statute
upon the subject covered by this provision. In that
state candidates' names by petition are not required
to file a written acceptance within a given time, or
at all; nor is the failure so to do expressly made
equivalent to a "declination," and a resulting va-
cancy created by operation of law. The New York
case relied on is, therefore, not the slightest authority
in this cause for any purpose.

I cannot pass silently by the intemperate attack,
covered by motion and affidavit, upon three members
of the court, including myself, for sitting in this
cause. And, under the circumstances, I consider the

matter of sufficient importance to place in enduring form and as a guard against future misunderstanding or misstatement, a few of the reasons controlling my action and the action of my associates in the premises.

My name and the names of those associates were originally upon both of the tickets held illegal and stricken from the official ballot by our own decision. According to the view of respondents, and under the decision of the court below, our names were still a part of those tickets and lawfully entitled to be certified upon that ballot. Had we, therefore, refrained from sitting in the cause, the large vote that would doubtless have been polled for those tickets would have been placed to our credit. Therefore, from the standpoint of respondents and under the judgment of the trial court, our decision was directly inconsistent with and inimical to our own personal interest.

Mr. Justice Gabbert in the principal opinion has demonstrated beyond successful contradiction that none of the names of the national or state candidates were legally upon those tickets. And he has given cogent reasons in support of his conclusion that the three members of this court referred to, were, in law, disinterested parties, and entirely competent to act. The correctness of that conclusion is strongly sanctioned by the further fact that not only were we no longer candidates upon those tickets, but no attempt was made *to substitute other candidates thereon in our places.* If, however, under any view of legal or judicial ethics, an interest could be imputed to us, still I maintain that, consistently with oaths of office and the performance of our official duty, we could not, under the circumstances, have refrained from finally participating in the decision.

Hoping that the remaining members, constituting a majority of the court, might agree, and re-

strained by a feeling of delicacy, we declined to act in the first instance.    The court had undoubted jurisdiction, but two of its members exercised their statutory discretion against proceeding to review the judgment before us, and no order of any kind was entered.

We then found ourselves confronted with the following conditions: the trial court had sentenced the secretary of state to jail for contempt, because, in the performance of his plain statutory duty, he declined to obey its erroneous judgment.    That court had then supplemented its judgment by directing the county clerk and recorder, pursuant thereto, to certify and the Smith-Brooks Company to print the two illegal tickets upon the official ballot.

Thus a ballot illegal in one respect as to the entire state, and in another respect as to the city and county of Denver, and counties attached thereto for legislative purposes, comprising almost one-third of the voting population of the state, would have been furnished to the people.    In so far as the presidential electors, the two congressmen, and the entire state ticket, were concerned, the action of the trial court would not have been more illegal if the judge himself had chosen another set of candidates and ordered them upon the official ballot.    And in so far as the city and county of Denver was concerned, the local official ballot would have been further vitiated by his supplemental order to the two parties named, in relation to the preparation and printing thereof.    The latter action would inevitably have led to an election contest, no matter which party succeeded, provided the vote in Denver affected the result; such contest being based upon the alleged invalidity of the entire ballot.    And the former action would, with equal certainty, have resulted in an election contest against the presidential electors and all of the state candi-

dates, had the candidates upon the two illegal tickets been successful, and the votes cast for those tickets been sufficient to change the result.

It is not necessary to speculate touching the probable outcome of those election contests. For present purposes, I need not go into the question of how far the manifestly erroneous decision of a *nisi prius* state court would be regarded as binding in connection with such an attack upon presidential electors. This court might possibly have considered itself precluded by a certain principle of law, from collaterally holding invalid the decision of the lower court, and rejecting the ballots cast for the two illegal tickets. But it is exceedingly doubtful if the federal courts, in so far as they might have had jurisdiction, would have given that decision similar controlling effect.

Nor is it essential for me to suggest that the national house of representatives would, if so disposed, have made short shrift of the decision in question, in a contest before that body against the two congressmen upon these two illegal tickets.

This court is the sole forum for the trial of election contests relating to its own members. Three of the present judges appeared as candidates upon the illegal tickets. The election contests against them would, therefore, have been tried by the remaining four justices. And in the event of an equal division, not an improbable contingency, the determination of those contests would have been indefinitely postponed. The title of the three justices changed would have been correspondingly clouded, and the performance of their official duties, seriously embarrassed.

An important additional consideration, not to be forgotten in this connection, is, that voters have a right to assume that all candidates and all tickets upon the official ballot are lawfully there. An un-

lawful ticket on that ballot is a deception and a fraud upon them. A fact also worthy of remembrance is, that the striking off of the illegal tickets in this instance did not interfere with the electors voting for the candidates designated thereon; as those candidates were also named for corresponding places on another ticket upon the official ballot.

The questions involved and which this court was called upon to consider were, therefore, purely and exclusively *publici juris*. They did not relate to private property or to private interests. They were not pecuniary or commercial in any sense. On the contrary, they dealt in the broadest and most material manner with public governmental affairs of both state and nation.

We have no constitutional or statutory provision relating to or in any manner affecting the status of a justice of this court in a cause where he may have a personal interest, direct or contingent. The subject *is* considered with reference to district and other *nisi prius* judges. And efficient statutes provide for calling in other judges or granting a change of venue in such cases. But no such provision exists touching a similar emergency here. Hence a justice of this court interested in a pending cause occupies a different position from a judge of a lower court possessing a similar interest. And decisions made by us under such statutes, dealing with the status of trial judges, obviously cannot be analogous or controlling as to this court. In all cases of original jurisdiction here, the interest of a single judge might render a decision impossible, and deny the litigant his constitutional right to a judicial hearing.

True, the weight of authority at the common law is against a judge presiding where he has a direct interest in the subject-matter of the controversy; although such eminent writers and distinguished

authorities as Coke and Blackstone emphatically reject the rule; and although everywhere both in this country and England, judges are continually sitting in contempt cases even where the offenses tried are against themselves.

But examination of the common law authorities will show that in nearly or quite all of the cases considered, the interested jurists presided over courts where a disinterested judge of co-ordinate or inferior jurisdiction could have been called in as a substitute, or the objections could have been removed by a change of venue. I have found no case where the question arose under circumstances at all similar to those here presented, and where no statute met the emergency.

Moreover, contingent, remote or problematical interests are rarely treated as disqualifying: "A remote or contingent interest will not affect the qualification of a judge, nor is it sufficient that he may be bound or obligated in the same manner as a party to the suit, that his title to land may be affected by the suit pending before him, that it is involved in another suit in his court in which the same legal questions may arise, or that he owns land on a stream next below the plaintiff who is suing to enjoin the pollution of the stream."—23 Cyc. 579.

And again, citing *Duncan v. McCall,* 139 U. S. 449:

"A court may determine the validity of a statute, although the decision involves the validity of other statutes prescribing the salary, term and qualifications of the judges composing the court."—23 Cyc. 579.

But, notwithstanding the latitude thus recognized, no one could deplore more than I, the necessity for a judge to preside where he has an interest, even though the same be merely contingent or re-

mote.   And no one would more strenuously condemn a judge, who, unless compelled by overpowering necessity, would consent to preside under such circumstances.

But there are times, fortunately rare, when a refusal to act, prompted by a refined sense of propriety or delicacy, would be little less than criminal. And such, in my judgment, conceding for the purposes of the argument that we had an indirect or contingent interest, would have been a refusal by us to participate in the decision under consideration.

I have shown that the questions presented for determination were public questions; that the validity of an election affecting the national and state governments was in the balance.   And that this court was therefore called upon to discharge a solemn public duty of the gravest import.   To have permitted the official ballot to go out vitiated by the infirmities under consideration, with all of the possible consequences, would have been a gross betrayal of the trust reposed in us.   It would have been an act of omission that ought to have subjected us to the severest condemnation of all good citizens, lawyers as well as laymen.   Considerations of delicacy or propriety growing out of our contemporaneous candidacy for office, were resistlessly swept away by grave exigencies involving the public welfare.