RuffiN, C. J.
 

 The Court has very deliberately considered the question arising in the case and we are all of opinion, that the decision in the Superior Court was erroneous, and that the Attorney General’s motion must be granted.
 

 Some preliminary objections may be stated to the course adopted in the Superior Court, which could not easily be obviated, although the main position were true, that, upon the death of one of the judges of this Court, the two surviving are not competent to hold the Court. Upon what rule of evidence is the affidavit of the prisoner to be deemed better proof than the certificate from this Court, that the prisoner’s appeal had been duly considered and decided? But, if that difficulty were removed, there yet remains the undoubted principle of law, that every act of
 
 a
 
 Court
 
 has relation
 
 
 *445
 
 to the first term, and the admitted fact, that Judge Gaston was then alive and sitting in Court, and, indeed,, as to this particular case, he united with the other Judges in hearing the argument in part. How could- the Superior Court judicially ascertain, that the opinion- of the Court was not formed and expressed with his concurrence,, although, after his death, the surviving Judges might- have been willing to hear any thing further that could be said for- the prisoner, that might change their opinions. We suppose, indeed, from his high judicial station, the Superior Court and all the other authorities of the State, might
 
 ex ojjicio
 
 take notice of Judge Gaston’s demise, and regulate their action accordingly. But the enquiry would still remain, what should be the action of the Superior Court, in such cases; and whether that Court should say that the prisoner’s case had not been decided by the three Judges,.in- opposition to- the certificate purporting to emanate from this Court,, as ofa day anterior to Judge Gaston’s death,that
 
 the Court
 
 (of which Judge Gas-ton then constituted a member) had-adjudged the prisoner’s case against him. If the Judge ofthe Superior Court entertained doubts of the authority of particular Judges hold this Court, and also found- reasonho believe that, in point of fact, thsse incompetent judges gave a particular judgment, it may be his duty in concience, as far as he can, to frame his own course in such a way as to enable the party, affected by the judgment, to bring the matter to the , consideration or reconsideration of the Supreme Court, when it shall be properly constituted, according to the notion ofthe Judge of the Superior Court. He may postpone the execution until after the succeeding term of the Supreme Court, and that tribunal, consisting of all the members which can sit in it, may then say, whether the supposed judgment is or is not the judgment of the Court, that is, whether the record of it is really a record of the Supreme Court,.or the minutes of persons usurping its authority. If some of the Judges assume powers which belong only to all of them collectively, it is undoubtedly, an offence, punishable by impeachment or in
 
 *446
 
 any other mode prescribed by law. It mnst be also undoubtedly true, that the Supreme Court is competent to devise a remedy for the party, against whom such
 
 pseudo
 
 Court professed to give judgment, by vacating the same, or in some other manner, and that these proceedings or a judgment of an inferior Court, founded on it, might be superseded, and the latter judgment itself finally be reversed or vacated. But in the mean while, considering the relation between the Supreme judicial tribunal of a State and all others,- it does not comport with that comity and harmony, which are indispensable to' their regular and useful action, that the inferior Court should resist the Supreme authority,- by' directly refusing to- obey the mandate of a writ in due form, and purporting to issue from the latter and to require certain acts to be performed by the former. It must be seen,-that it is better to leave to this Court, in the first instance,- the redress of wrongs done to a citizen in its name by persons, not legally constituting the Court, than for a Judge ofthe Superior Court to take on himself to protect the public from the supposed usurpations of those, who are vested with a higher judicial authority than his otvn. Fox-,- if it be right, that he should do so in this instance, it must be so in every case in Which he might think this Court had not jurisdiction, although all three of the judges of this Court might have held and decided,- that they had. Upon the question of jurisdiction, the consequence is necessarily the same that an adjudication beyond it is void, no matter who makes it, whether some or the Whole of the judges. If, therefore,- a Judge of the Superior Court should think, that this Court,- fully constituted according to his own admission,- hath transcended its jurisdiction, he Would, upon the principle' of the decision in this case, not be bound by the judgment, but obliged, moral-ly and legally, to resist it. The effect would be, to make the Judge of the Superior Conrt the paramount judge; since if the Supreme Court should again say, as we do ill this case, that the former decision was rightfully made, the inferior Judge replies again, that he is still not bound, because the
 
 *447
 
 Supreme Court had not jurisdiction, and therefore was not competent to make the decision. This absurdity and the very nature of judicial subordination prove, that, as in respect-to the jurisdiction of other Courts and other general questions of law, the decision of the Supreme Court is final, so in respect to its own jurisdiction the decision of the Supreme Court must not only be final, but its right to decide it must be conclusive. Although the sovereign may punish the Ju dgcs for assuming a j urisdiction not conferred by law, yet in respect of other Courts, what the Supreme Court holds to be within its jurisdiction is thereby made so, inasmuch as no Court can reverse the decision, nor can be allowed to resist it, unless it may also be allowed to refuse to carry into execution every judgment of the Supreme Court, which to the inferior Court may seem erroneous. To correct a mistake of the Supreme Court on a question of its jurisdiction, or to va--cate and annuli proceedings done in the name of the Supreme Court, and entered among its records as the acts of the Supreme Court, must, necessarily, be the province of the Supreme Court itself, and of that alone.
 

 The foregoing observations have not been made with the view to a decision of the case without the discussion or decis--ion of the larger question, with respect to the powers and duties of the persons, appointed to be the judges- of this-Court. Far from it; for it would not become us,- who sit here, to evade th'e direct decision of that question by any means whatever. Indeed, we should not have stopped to say a word on the subjects hitherto discussed, had we not thought it of some consequence to state, what is the proper course to correct an excess of jurisdiction by this Court, or the assumption of its authority by persons not fully invested with it, so as to avoid the direct conflict between the Supreme and Superior Courts in the manner exhibited in this case.
 

 For the purposes of the other question, we will, then, assume that Judge Gaston had died before the last term be
 
 *448
 
 gan and that his seat had not been filled. The enquiry is 'whether, in that case, the two surviving Judges were obliged to hold the Court, or was the whole jurisdiction suspended until the appointment of a successor. Few can doubt, on which side our answer would be, if we were allowed to consult our personal ease or private wishes only. Tt can be understood by any one, and we know by experience, that the burden of this office is much lighter when divided among three than two. It is very sensibly so, as respects the degree and. duration of the labour, bodily and mental. But the-difference,, in point of responsibility, to one having just views of the functions of a Court of the last resort for causes of all kinds, criminal, common law, and equity, is not easily to be conveyed to one, who has not known for himself. We had’every motive,, therefore, apart from a sense of duty, to postpone the-exercise of our office until our share of the duties would be smaller and their difficulty diminished. But the judicial power is not conferred on the Judge for his own gratification, either by distinction in station or for its emoluments, but for the public service. If, therefore, the Judge finds he has the power to decide a cause brought before Kim,.a correspondent duty instantly arises, that he should decidfe it. We have no more right to decline exercising a power, conferred by the law for the general benefit, than we have to assume powers withheld by the law for the common safety:. Accordingly, when the lamented death of Judge Gastox occurred, I can with truth say, my brother Daniel and myself, with a single eye to our public duty, set ourselves earnestly to enquire what the Legislative will and the general rules of law authorised us to do in that emergency ; and, with all thedights we could get, having come to the conclusion, that the judicial power survived, notwithstanding the death of one of the members of the Court, it followed, as a corollary, that we were obliged to exercise it, and proceed, in administering the law of the country. It is due to ourselves and to the Bar, which, owing to particular circumstances, attended at the time in greater numbers than
 
 *449
 
 usual, that we should say, the question did not passs
 
 sub si-lentio,
 
 nor was the conclusion arrived at upon slight consid-oration. On the contrary, the Judges thought of it deliberately; and we communicated our views publicly to the Bar, inviting their particular attention to it as a body. The next day, I again stated from the bench the opinion the Judges had formed on the point and the general grounds on which we went; and requested, if the opinion of the Bar was different, or if any gentleman had doubts on it, that it should be fully argued. The opinion of the Bar was then given unanimously, that the surviving Judges had the power of holding the Court. One gentleman, a particular personal friend of my own, suggested, indeed, to me in private, that although we had the power, yet .suitors, and, perhaps, other persons, might not have as much confidence in a Court of two as of three J udges; and, therefore, that the exericise of the power might create a dissatisfaction, which it might be prudent to avoid. With sincere thanks for the suggestion, I was obliged to decline it’ as I felt as little at liberty to consult the pleasure of other people upon the question, as I had to consult my own inclination and ease touching it.
 

 Another gentleman, Mr. Henry, said, that as he was the only member of the Bar, who had, from the first, entertained a doubt, he would mention the ground of it. He then stated, that taking the Act of 1834, Rev. Stat. Ch. 32. s. 4., literally, he had received the impression, that the authority to hold the Court was given to two Judges only in the single case, when the third Judge was disabled from attending by sickness or the like cause, but that whenhecame to reflect upon the absurdity of treating the sickness of a Judge as a strict condition precedent to the exercise of the judicial power by the other two, which would be to require two Judges, when there are three, to hold the Court,but prohibit them from doing so when there are but the two, he had at once given up that construction of the act, as too narrow and technical, and discreditable to the Legislature. I then proposed to put our reasons for the opinion into writing, that thereafter it might
 
 *450
 
 to have been distinctly determined; but by general 'consent the point was deemed so plain that it was thought no one could doubt on it, and that we might well spare om-selves the pains of writing an opinion.
 

 I will now, however, state the general views taken by us upon the occasion mentioned; which, indeed, are much the same that we now entertain. Before doing so, however, it may be well to dispose of some matters which really seem too trivial to be introduced, to aid in construing a statute constituting a high Court of justice.
 

 In the first place, then, we admit, that if persons refer a question to the arbitrament of three, the award cannot be made by two of them, but only by all three. But the Judges of this Court are not arbitrators. Although arbitrators are
 
 sometimes, by way of
 
 similitude and illustration, called Judges of the parties’ own choosing, there are great differences between them and us. Arbitrators are appointed by the agreement of the parties, and therefore they must act according to the agreement; and when the agreement is for a decision by three and not by a majority of the three, all must concur; else, it is no award at all. It is a case of mere private power. But we are appointed by the country and to decide causes, whether the parties will or will not, according to the course of the law. Now, the rule with respect to powers of a public nature, even though not judicial, conferred on several, is, that the decision of a majority is valid. Co. Lit. 181, b. This is a settled principle of the common law, descending even to aggregate corporations. Thus in
 
 the Attorney General
 
 v
 
 Davy,
 
 2 Atk. 212, Lord Hardwick held, that a majority might act, though nothing was mentioned in the charter to that effect. The same doctrine was applied to contracts made by church wardens and overseers of the poor in
 
 Rex
 
 v
 
 Beeston, 3
 
 T. R. 592. And the general principle is stated and fully considered in
 
 Grindley
 
 v
 
 Barker,
 
 1 Bos. & Pul. 229. The only exceptions to the principle, within ora recollection, are juries. The common Jaw wisely requires the verdict of a petit jury to be unani
 
 *451
 
 mous; and, in favor of the accused, that a grand jury shall not act by a lean majority, but that a bill must be found by not less than twelve. But a Court of justice is neither a body of arbitrators, nor a jury of either kind.
 

 We likewise admit, that, if a statute empowers two judicial officers to do a particular act, they must meet and execute it, together, and cannot act separately; as if an appointment of overseers under the 43 Eliz. be signed by two justices, separately, it is bad.
 
 Rex
 
 v Forrest, 3 T. R. 38. But there can be no majority of two persons which will not include both; and as that is so, the parties have a right to their united judgment on consultation. But that does not establish, that the general rule, that a numerous body, that is to say, consisting of three or more, with powers for public purposes, may act by the major part, does not apply to a Court composed of three or more. On the contrary, it is peculiarly fit that judicial decisions may be made by a majority; else, litigation would be interminable. So, if two may give the judgment of the Court against the third, two must be competent to hold the Court alone, unless the commissions of the Judges or the statute constituting the Court require, that all three should unite in the judgment, or, at the least, that they should all meet together, so as in every case to take the sense of each and every one of them.
 
 A
 
 fortiori, if one of the three be dead, the survivors, who still constitute a majority of the whole, must be competent to act. It is to be remembered, that the question concerns the exercise of the judicial power, and that the general interests require, that, as it is absolutely necessary to the welfare of the State, and may at all times be needed, it should never be suspended, unless the legislative will to that effect be plainly expressed, or is to be as plainly implied. We admit, indeed, that if the commissions, or the statute according to a just interpretation, require all the Judges to unite in opinion, or even to be present when the judgment is given, then less than the whole number can do nothing, from whatever cause the whole number may not have convened. So, if a particular number oí a
 
 *452
 
 larger body bo required, the consequence is the same.
 
 Thus
 
 the statute, constituting our County Court, and authorizing all the justices, “ or any three of them,” to hold the Court, plainly implies, that less than three cannot hold it. But simply appointing a certain number of Judges of a Court, exceeding two, does not in itself amount to an enactment, that all those Judges should either unite in judgment or in consultation; nor does it import, that they should unite in consultation more than in opinion. The question therefore depends upon the proper rules of construction to be applied to statutes regulating or conferring judicial powers, and the true meaning of our statute, ascertained by those rules.
 

 , Now, we begin with the principle, that this is not like the grant of a private power and to be construed strictly, according to the very letter; but that it is of a public nature, to be exercised for the common weal, and, therefore, may be exercised by the major number of those with whom it is entrusted. Nay, we further say, that this is not an ordinary power of á public nature, as to build a Court-house, or lay off a town, or to superintend the police of a town, but it is one of great powers of State, the necessity for which is so unvarying and indispensible, that it is not to be presumed the Legislature intended that it should be inefficient or dormant, while it could be exercised by such a proportion of the whole number of its depositories, as might exercise it, if it were any other power of a public nature. Therefore, when the statute is silent as to what number of the Judges shall unite in the judgment, a majority may give it; and, in like maimer, when it is silent as to the number of Judges who shall unite in consultation, a majority must suffice. That is precisely the character of the act which created this Court. It provides, that three Judges shall be appointed and commissioned, as Judges of the Supreme Court of North Carolina,
 
 and that it shall be the duty of the said Judges and their
 
 successors,
 
 to hold the Court twice a
 
 year,
 
 until all the business shall be determined.
 
 It makes it the duty of each and all of us to hold .the Court, but it does not say,
 
 *453
 
 that a less number should or should not hold it. There is, then, no express provision in the act upon either question; that is to say, what number of the Judges shall convene in order to have power to proceed in the business, or, after the requisite number shall have convened, what proportion of that number shall give the judgment of the Court. Now, it is not denied that there is such a difference between the two purposes, for which a certain number may be required, as may well induce the legislature to require the whole to convene, though the whole, when assembled, may not be required to concur in the judgment. But the question is, whether in this act we can see, that the whole number is required for one of those purposes, more than for the other. And we own that we cannot see in the act the least difference in that respect. If it requires all the Judges to be united in consultation, so it does in judgment also, according, to its terms. But it is said the act in several instances makes a distinction between the “Judges” and the “Court,” and, therefore, that “ the Court” means all the Judges. Certainly the act speaks of the Judges as several persons, and of the Court, as con: stituted by several Judges. But it does not follow,that it is, at all times, necessarily to be composed of the three Judges, and not of a less number, when the three cannot attend, or are not all in being. The act speaks of the Judges, severally, in conferring on them, distinctly from their duties in the Supreme Court, power to issue writs of
 
 Habeas
 
 Corpus, and indeed all the powers of a Judge of the Superior Court of Law and Equity, except holding those- Courts. Therefore, iu that respect the Judges are distinguished from the Court. But the act likewise speaks oí “ the Judges of the Supreme Court,” when it is clear it refers to their action in conjunction and in Court, as upon any other occosion of thus acting ; as for example, that “ the Judges” shall appoint a Clerk and a Reporter, and shall prescribe rules of practice for the Superior Courts. All these being proceedings in which they do not act separately, but together, in acts which they record. But if “ the Court” mean more than one
 
 *454
 
 Judge — as we will not question — still, how can we say, it means all of them and not a majority ? It is absolutely certain, that “the Court” cannot mean all the Judges in giving the judgment of “ the Court,” for unanimity was never required in any Court, and there have been many dissents in this Court. Indeed, it is admitted at the bar, that to this purpose, “all the Judges” are not required to constitute “the Court.” We claim no benefit from the admission, save only as it aids in the construction of this statute, for it is undoubted law, that it may require more than a majority, or even the whole number of a public body to assemble before the body will be properly constituted ; and also that when the requisite number has assembled to constitute the body, then unless the law specially require a certain number to make a decision, the majority of those present may not only decide a question, but their decision is that of the whole body, and not of the persons merely who compose the majority.
 
 Grindlay
 
 v
 
 Barker,
 
 1 Bos. & Pul. 229. We see the principle familiarly exemplified in our legislative bodies. The Constitution of the United States requires two-thirds of the Senate to concur in approving a treaty, or in a conviction or impeachment. But generally, when the number prescribed to form a quorum has assembled in each House of Congress, their acts, whether passed unanimously or by a naked majority of those present, are “ Acts of Congress,” of the whole body, and not of those persons, whose names are recorded in favor of it on the journals. Therefore, in all cases it is to be enquired, what number, after convening, may act for the whole, either upon particular subjects or generally. That is the enquiry upon the act creating this Court. It is said, that all the Judges are required to compose a Court, by force of the term “ Court.” Certainly, that does not necessarily follow; for a Court is often held by a part of those who have the power of sitting in if, and, if it were not so, some numerous Courts never would beheld, as all the members never would be got together. Then, it is said, that if that be not so, generally, the word is used in that sense in this act. But that is disproved by the fact, that the judgments of “ the Court” are given by the majority oí the
 
 *455
 
 judges. If all the judges be necessary to constitute “the court,” then all must be also necessary to give the judgments of the “ court,” as far as the import of that term, in itself, goes. But it is admitted, that is not true iu the latter respect, and that the majority may give the “judgment of the court.” But upon what principle is that so ? It is not in the statute, in words, that two may decide against one. Therefore, we must resort to something else to restrain it. Itjs said, that it arises from necessity. But what is the necessity? It must depend upon reasons differing from those which require arbitrators and jurors to be unanimous. Why, plainly this is the necessity: to prevent the failure of justice by having no decision. It is the old principle of the common law, that the interest of the public, that powers of a public nature should be exercised, makes it necessary to enable the majority to act in opposition to the minority. A necessity of precisely the same nature, if not to the same extent, calls for the exercise of the judicial power by the majority of a court in the absence of the minority; and especially requires that the power shall not become dormant upon the death of a judge. But the argument is added, that the decision of the majority is more apt to be right, when the reasons of a dissenting judge have been heard, and will be entitled to more confidence, than if made by the majority alone. That may be true; and it may therefore be so far policy to entrust the power of decision to two, the three being present, rather than to two in the absence of the third, or when there is not a third. But that is a point for the consideration of the Legislature; and when they say so, they will be cheerfully obeyed. But when the -act contains no such re-restriction upon the 'power of two to act alone, more than upon the power of two to decide, we cannot interpose a restriction in one respect more than in the other. Until, therefore, the Legislature shall have said, that all must concur in giving the judgment of the court, we shall continue to give it according to the opinion of the majority. And, in like manner, until the Legislature shall have said, that upon the death of a judge, the surviving judges are to receive their
 
 *456
 
 salaries and do- nothing, but that the court is to be shut against suitors,, we think the survivors bound
 
 to
 
 proceed in their office, and administer the law.
 

 Views like the foregoing induced Chief Justice Henderson and Judge Hall, to hold the court alone at December Term, 1829. Judge Toomer accepted a temporary commission upon the death of Chief Justice Taylor, to expire at the end of the next session of the Assembly. I was appointed to succeed him, and of course, to come into office at the end of the session. Upon the resignation of Judge Toomer, during the sitting of the Legislature, there was a chasm between his going out and my coming into office, which, being for so short a time, the Legislature did not think it worth while to fill. But it so happened, that the Assembly did not adjourn until the 8th day of January, 1830, while the term of the court began on the 28th of December, 1829. During the interval, then, there was a vacancy on the bench ; and during that interval the two old Judges held the court. They did not do so
 
 siib silentio.
 
 They considered it, and also did me the honor to consult me on it. It was likewise the subject of conversation at the bar and in the Legislature. By common, if not universal concurrence, it was agreed, that the two Judges, being all then in existence, ought to hold the court. If there had been a serious doubt to the contrary, the Legislature would immediately have done one of two things : either have filled the vacancy by electing a Judge for-the residue of the session, or have passed an act to keep the court open from day to day until the end of the session. Neither was done; but the court was held by the
 
 two
 
 Judges eleven days in the same building, in which the Legislature was sitting. It is true, that not much business was done, as none was pressing, and all expected the court to be full in a few days. But several motions were heard and decided, and orders made in causes; and, to the purpose of shewing the opinion of the Judges upon the question of power, one decision is as important as many, if deliberately made. That, indeed, was a much stronger case than ours •, as then an appointment had actually been made, that would
 
 *457
 
 fill the vacancy in a very short time. Yet they did not await that time,
 

 Nevertheless, it is known that partly from scruples of one of the Judges, perhaps, over-punctilious, and from' a general desire on the bench to obtain all possible aid in making decisions, it became a practice when a J udge was absent from sickness of himself or his family, not to proceed with the business until he could attend. This caused business to accumulate, and consequently, a delay, which was the occasion of some complaint. That produced the act of 1834, which forms the 4th section of Rev. St. c. 33, and enacts, that when any one of the Judges is disabled from attending,' two of them shall hold the court. That the act was necessary for the sole purpose of distinctly declaring it to be the duty of two of the Judges to hear and determine the causes, and thus compelling them to do so, has, we think, been shewn upon the general principles already considered. But, further, it follows from the known practice of two Judges deciding cases in which the third Judge could not, with propriety, sit.
 

 The act of 1818 provided for calling in Judges of the Superior Courts, when one or more of the Judges of the Supreme Court, from personal interest or other sufficient reasons, was incompetent to decide. The act of 1821 repealed. the provision, but was never meant to render, and could not render a Judge competent to decide his own cause or that of his near relation. Even under the English constitution, a statute, making a man the Judge in his own cause, would, in the opinion of Mr. Blackstone, be void, as contrary to natural justice aud the reason of every man. So, of course, it was understood here, and therefore cases in which one of the Judges felt an interest — and there have been several — have been decided by the other two, both before the act of 1834, and since.
 

 It was thus seen, that there svas not in the commissions of the Judges nor in the statute which established the court, any cause directly making the whole number of Judges necessary to hold the court; that two of our prede
 
 *458
 
 cessors under that act had held the court with the knowledge, at the time, and, consequently, with the approbation of the Legislature; that in other instances two had, by themselves, decided, when the third Judge was incompetent from interest or favor; that there had been no refusal of two, when the only Judges, to act; but that there had been instances of their omitting to do so when one of the body could not attend; and that the Legislature had passed an act, which did not restrain two from acting as they had before done, but was directed solely against the omission of two to act in the necceary absence of the third, and forbids such omissions for the future: the argument seemed complete, that both upon common law principles and from the clear purpose of the Legislature, two surviving Judges are under an obligation to keep the court open for the dispatch of business, Indeed, if there had been nothing else but the act of 1834, and there had been in the act of 1818 a provision requiring the attendance, of the three Judges as necessary to compose a court, we should have thought, that after 1834, two Judges could constitute a court, when the other was dead. We cannot view that merely as an enabling act, conferring power on two Judges to hold the court, when it should happen as a special contingency, that there were three Judges
 
 in esse,
 
 and two of them were able to attend and the other was not able. It seems to us, that so to regard it, would be to look at the letter more than the sense of the act. The purpose of the act is to prevent delay of justice by expediting decisions of causes in this court: which has been a favorite purpose with the Legislature from the foundation of the court, the act of 1818, having required the court to sit at each term “ until every cause prepared for decision should be heard and determined.” Then the act of 1834 comes in to remedy an omission of two of the Judges to hold the court, when the other was unable from sickness to perfonn his duty. Surely his death creates a like exigency for the services of the two surviving. For, it is most absurd, that two Judges should be able and bound to hold a court, when there are three Judges; and yet that they
 
 *459
 
 should not be bound nor allowed to hold the court, when there are but two. Such were the grounds on which my brother Daniel and myself proceeded at the last term. They have lost none of their force from subsequent reflection or on further research: and my brother Nash directs me to say that he entirely concurs therein.
 

 We find, indeed, that we were wrong in supposing that the general rule, in respect to the exercise of powers of a public nature, is applicable to the judicial power. The common law deems it of such high consequence that it shall never be suspended, but that the tribunals of justice should at every term be always open to suitors, that it adopted the principle that each one of several Judges of a court may hold it.
 

 Sergeant Hawkins thus lays it down in his chapter on courts of criminal jurisdiction. He says, that, regularly, when there are divers Judges of a court of record, the act of any one of them is effectual,
 
 especially if their commissions do not expressly require
 
 more. So if a writ be directed to two coroners, one of them may not serve it, as it is a ministerial act; but one of them may hold an inquest, because that is an act judicial. Viner Abr. Coroner D. Thus it appears that, at common law, each Judge has the full judicial authority, unless he be required expressly to exercise it in conjunction with others; as in the
 
 quorum
 
 clause of the commissions in England, or'the provision in our act requiring three justices of the peace at least to compose a County Court. Accordingly one Judge has .often sat on the two benches of 'Westminster-hall; though as there is very seldom an occasion for it tobe done, he prudently declines the decisions of demurrers or difficult points of law. 3 Chitt, Gen. Pr. C. 6 to 17. It will not, however, be understood, that this court can be held by one Judge; for however that might have been before 1834, the act of that year, which requires, as we think, two judges to hold the court whenever it becomes necessary by the sickness or the death of an associate or otherwise, yet plainly imports that less than two Judges shall not hold it in any case.
 

 
 *460
 
 But we have been still more fortunate in laying our hands on an adjudication upon a statute and on circumstances very similar to our own. An act of Congress of April 29th, 1802, established Circuit Courts, and enacted that they should consist of the Judge of the Supreme Court residing within the circuit of the Judge of the district, where thecourtshould be hold-en, and of the District Judge; with a proviso, that when only one of the Judges, thereby directed to hold .the Circuit Courts, should attend, then the court might be held by the Judge attending. Judge Patterson was thejudge of the Supreme Court residing in the circuit in which Connecticut was situate ; and, of course, he and the District Judge of Connecticut were the judges, “of whom the Circuit Court,” for that State, “ consisted.” An action was brought to that court, then held by the District Judge, and the defendant pleaded to the jurisdiction, that Judge Patterson was dead, and that there was no other judge of the Supreme Court residing within the circuit. Upon demurrer it was insisted there, as it has been here, and, apparently, with better ground for playing upon the word, “ court,” that, although the judge might hold a session or term of the court, while both judges were living, yet, that by the death of one of the judges, of which the court “consisted,” the court was no longer existing; inasmuch as a
 
 whole
 
 consists of its parts, and, as one half was gone, the whole did not exist. But the Supreme Court of the United States held, that there was a Circuit Court, notwithstanding it was to consist of two judges, and one of them was dead. For that opinion Chief Justice Marshall gave this satisfactory reason: that the Circuit Court consisted of two judges, either of whom was capable of performing judicial duties; and that the death of one could not disqualify the other for discharging his-official duties, until the vacancy should be filled.
 
 Pollard v Dwight,
 
 4 Cranch 421. The case is exactly apposite to ours. Here, two of the judges are, by the statute, capable of acting, if the third be disabled from attending ; consequently they do not become incapable by the death of their afflicted brother. If Judge Gaston had languished on a sick bed during the
 
 *461
 
 •whole term, the other members, of the court would have been obliged to go on with the business. Surely his death can neither impair their capacity nor obligation still to do so.
 

 Per Curiam. Mandamus ordered.