## Bob Long v. The State.

### No. 272.   Decided March 16, 1910.

#### Rehearing denied April 19, 1910.

**1.—Murder—Evidence—Impeaching Witness.**

Where, upon trial of murder, the sister of the defendant had testified that the Superintendent of Public Schools had told her that the deceased was the cause of her removal there was no error in permitting the State, in order to contradict defendant's sister, to ask said Superintendent whether he told her that the deceased was the cause of her removal.

**2.—Same—Evidence—Refreshing Memory of Witness.**

Where, upon trial of murder, the State's witness emphatically denied that defendant's sister ever made any complaint to him as Superintendent of the Schools about a certain insult to her by deceased, there was no error in re-

fusing defense counsel to introduce in evidence a certain remark made by said Superintendent to the said sister of the defendant which was wholly immaterial and could not serve to refresh the memory of the witness.

### 3.—Same—Evidence—Insult to Female Relative—Contradicting Witness.

Where, upon trial of murder, the defense relied upon an insult by deceased to defendant's sister, there was no error in admitting testimony that the said sister of defendant after the alleged insult contributed something towards the purchase of a present for the child of the deceased.

### 4.—Same—Evidence—Contradicting Witness.

Where, upon trial of murder, the defendant claimed insulting conduct by the deceased towards his sister, there was no error in permitting the State to introduce a conversation between the said sister of the defendant and third parties that she told her brother two days before the homicide that she had been transferred from the schools by the Superintendent and would have to go through the rain, etc.; she having denied making such statement when she testified for the defendant but stated that she was transferred on account of said insulting conduct.

### 5.—Same—Misconduct of Bystanders.

Where, upon trial of murder, the evidence showed that the deceased was a teacher in the public schools in which the defendant's sister was also employed as teacher. and that the homicide grew out of the conduct of the deceased towards said defendant's sister; and it appeared from the record that during the closing argument of State's counsel the teachers and the children of said public school attended the trial, and defendant complained that this was done for the purpose of influencing the jury in behalf of the State. Held that this was not a cause for reversal.

### 6.—Same—Jury and Jury Law—Challenge for Cause.

Where, upon trial of murder, it appeared upon appeal that no objectionable juror was taken on the jury who tried the defendant, and there was no bill of exceptions by bystanders controverting this explanation by the court, there was no error.

### 7.—Same—Charge of Court—Insult to Female Relative—Adequate Cause.

Where, upon trial of murder, the evidence showed insulting conduct by deceased towards the sister of the defendant and other provocations, and the court in his charge to the jury not only submitted said insulting conduct but all other facts and circumstances that might have a bearing upon defendant's mind, in his charge on manslaughter, the same was sufficient, and there was no error in the court's action in not limiting his charge to the single purpose of passion growing out of such insulting conduct.

### 8.—Same—Charge of Court—Insulting Conduct to Female Relative.

Where, upon trial of murder, there was evidence of insulting conduct by the deceased towards the defendant's sister and that she informed defendant thereof shortly before the killing, and the court instructed the jury that if the defendant killed the deceased upon the first meeting with him after said communication it would afford adequate cause, etc., the same was sufficient, and there was no error in the court's charge in not selecting one cause of insulting conduct, there being more than one.

### 9.—Same—Charge of Court—Self-Defense—Manslaughter.

Where, upon trial of murder, the evidence showed that there was no termination in the difficulty between defendant and the deceased, and that the evidence did not raise the issue of self-defense, there was no error in the court's failure to charge on self-defense. Nor was the court's failure to instruct on manslaughter on a particular phase of such continuing difficulty error.

### 10.—Same—Sufficiency of the Evidence.

Where, upon trial for murder, the evidence was sufficient to sustain a conviction of murder in the first degree, the same will not be disturbed.

**11.—Same—Disqualification of Judge—Quorum of Court of Criminal Appeals.**

Where, upon appeal from a conviction of murder, it appeared from the record that one of the judges of the Court of Criminal Appeals was appointed upon said court, and was disqualified to sit in the case because of his having been of State's counsel when the appeal was submitted, and a decision affirming the case was rendered by the remaining two judges of the court, who constituted a quorum, there was no error. Following City of Austin v. Nalle, 85 Texas, 520, and other cases.

Appeal from the District Court of Lamar. Tried below before the Hon. Ben H. Denton.

Appeal from a conviction of murder in the first degree; penalty, imprisonment for life in the penitentiary.

The opinion states the case.

*Moore & Park* and *B. B. Sturgeon* and *N. B. Birmingham,* for appellant.—On question of admitting evidence as to presents made by sister of defendant to child of the deceased after insult to her by deceased: Drake v. State, 29 Texas Crim. App., 265; Rainey v. State, 20 Texas Crim. App., 473; Jones v. State, 51 Texas Crim. Rep., 472, 101 S. W. Rep., 996; McCoy v. State, 25 Texas Supp., 33; Hobbs v. State, 53 Texas Crim. Rep., 71.

On question of challenge of juror: Shannon v. State, 34 Texas Crim. Rep., 5, 28 S. W. Rep., 540; Black v. State, 42 Texas, 377; Keaton v. State, 49 S. W. Rep., 90; Quinn v. State, 51 Texas Crim. Rep., 155, 101 S. W. Rep., 248.

On question of disqualification of judge: Articles 64-72, Code Crim. Procedure; article 5, sections 4, 11 and 12, State Const.; article 14, Const. U. S.

On question of conduct of bystanders: State v. Webb, 41 Texas, 67; Turner v. State, 38 Texas, 167; Mullins v. State, 37 Texas, 337; Owens v. State, 35 Texas, 361.

On question of contradicting defendant's witness: Marsh v. State, 54 Texas Crim. Rep., 144, 112 S. W. Rep., 322; Jones v. State, 51 Texas Crim. Rep., 472, 101 S. W. Rep., 993.

*John A. Mobley,* Assistant Attorney-General, for the State.

DAVIDSON, PRESIDING JUDGE.—Appellant was convicted of murder in the first degree, his punishment being assessed at life imprisonment in the penitentiary.

He was charged with killing Professor J. G. Jacoway. Without going into a detailed statement of the facts, the record substantially shows that deceased was walking east on Graham Street in the city of Paris, with his young child in his arms, and about the time he arrived opposite the residence of Mr. Campbell appellant came around the corner of Campbell's house carrying a pitcher of milk in one of his hands; that he saw deceased, who was going north; that appellant im-

mediately turned northeast, going towards an open driveway at the
northeast corner of Mr. Campbell's yard; they met near the juncture
of the sidewalk and Campbell's yard. When in about ten feet of each
other they stopped, deceased facing towards appellant; appellant drew
his pistol, and deceased placed or threw his child on the ground, and
started towards appellant; that appellant fired about the time that de-
ceased threw his child to one side; that deceased immediately clinched
with appellant, who fired two or three shots after they came together.
The parties scuffled around several feet back into Campbell's yard
where they fell, and appellant struck deceased on the head with the
pistol after he fell. After appellant had shot, Campbell, who was
standing in his yard, called to him as follows: "Bob Long, what in
the name of God have you done?" to which appellant replied either,
"He has insulted," or "he has persecuted my sister until I am sick
and tired." Appellant immediately proceeded to the courthouse and
surrendered to the justice of the peace; the sheriff coming in in a few
moments he delivered his pistol to him. Another witness testified
that he was clerking in the store of John D. House, and about a week
or ten days before the homicide appellant came into the store and
bought six or eight cartridges of a caliber which would suit the pistol
used by appellant in shooting deceased. Appellant put the pistol in
his pocket on Friday evening before the killing Saturday morning.
Appellant, through his sister, Miss Love Long, placed in evidence the
fact that she was a school teacher in the public schools, and had been
for about fifteen years; also for several years she had been teaching
at the Graham school, which was presided over by deceased as prin-
cipal. She also testified that deceased had at different times sought to
have her removed as teacher from the public schools at Paris, and one
time, several months or perhaps a year before the homicide, he had
made complaint against her before the board of trustees, and the
board had refused to remove her as teacher. She also testified that
deceased had on several occasions made vulgar and indecent allusions
to the children and others in her presence, and that she had told him
that he must not make such statements in her presence. She further
stated that several months prior to the homicide she had gone into
the ladies' dressing room at the Graham schoolhouse about three
o'clock one afternoon while the children were engaged in writing, it
being their concluding exercise for the day; that while in the room,
having her hair down and combing it, deceased partly pushed the door
open and entered; that she told him this was the ladies' dressing room,
and forbid his coming in, but he continued to advance, and came into
the room, and made as if to take hold of her hair and said: "That
looks good to me;" that she told him he must leave the room, but that
thereupon he advanced a step or two, thrust his hand into her bosom,
touching the flesh, and said, "What have you in there, anyway?" She
told him if he did not leave her that she would scream, and in reply
he said, "You would be in a pretty fix if you were to scream in here,

wouldn't you?" He then passed out of the door, and placing her hand in her bosom she found that he had left a lot of pecan hulls inside her waist and corset. She also testified that shortly after this occurrence at the high school building she told Professor Wooten, Superintendent of the Public Schools of Paris, of this insult, and Wooten replied, "Miss Love, my teachers may criticise me at times about being a little rough, but they can never say that I did anything like that." She also testified that a day or two before she conversed with her brother about the matter, she learned that she had been transferred as a teacher from the Graham school to the Second Ward school, which was very much farther from her home; that this subjected her to great inconvenience; that she lived within a very short distance of the Graham school. She also testified that she felt like her brother ought to know what was going on, and that on Thursday night before the killing on Saturday morning she communicated all the facts to him, including the insult given her by deceased at the Graham schoolhouse; that her brother, after she told him, became very nervous, slept but little that night, and was not off the place up to the time she left him to go to a neighbor's for the night on Friday afternoon. That she did not know of the homicide until some time after it occurred. Appellant also proved by Miss Canfield that in the month of May, 1907, that she and Miss Love Long were at the high school building in Paris, and Professor Wooten was also present; that they were there with reference to school matters, Miss Canfield being a teacher in the school; that when they left the building they went away together towards the courthouse, and while on that trip, Miss Long, appellant's sister, told her of the incident previously narrated in regard to deceased coming into the room when she was combing her hair. Appellant also introduced evidence to the effect that he was nearsighted and could not distinguish a man across the street. It may be stated as a fact that deceased was killed at the first meeting between himself and appellant after the insult was communicated to him by his sister. Appellant testified that he did not purchase cartridges from the witness Proctor as Proctor had testified, and both he and his sister swore that they had a box of cartridges which fit the pistol he used and had had for several months. There was also evidence contradicting and impeaching Miss Long in regard to her statements as to the insults. There was also testimony introduced to the effect that she contributed to the purchase of a present for the child or baby of the deceased some time after she stated the insult was offered her in the dressing room. The State's theory was that appellant became enraged because of the fact that his sister was transferred from the Graham schoolhouse as a teacher to another one more distant, and which placed her at considerable inconvenience in going to her school work.

1. Bill of exceptions No. 1 recites that J. G. Wooten, Superintendent of Public Schools of Paris, while testifying, was asked by State's counsel the following question: "Did you tell Miss Love Long

when you told her that she was going to be transferred, that Professor Jacoway was the cause of it?" Appellant interposed objection to the witness answering the question because Miss Long, a witness for and sister of defendant, had already been asked the question as to whether Professor Wooten had told her that deceased was the cause of her being transferred from one school to the other; and having answered in the affirmative, the State was bound by her answer because it was a matter collateral to the issue in the case; and for the further reason that the witness could not be impeached except upon material questions and questions pertinent to the issue. The witness was permitted to answer, and stated he did not make such statements to Miss Long. The court qualifies the bill as follows: "The witness Miss Love Long had testified for the defendant in her examination in chief in answer to questions asked by defendant's counsel that her removal from the Graham school was without her consent and she supposed it was done at the instance of Professor Wooten through Professor Jacoway, that she had been informed on Wednesday before the killing by Professor Wooten. Whereupon on cross-examination the witness denied that in that conversation with Professor Wooten in which she was told she would be removed from the Graham school that Professor Wooten told her that Professor Jacoway had nothing to do with it at all." We are of opinion this testimony was admissible. It was an issue of fact as to this matter. She stated that Professor Wooten had told her that deceased was the cause of her removal. Wooten was placed on the stand to contradict this. The fact that deceased was the cause of her removal from one school to another entered into the case. She had claimed to have told her brother this fact, and it was one of the causes which seemed to have irritated him. This was a material question as we view this record. She had stated that such was the case, and that she had received information from Wooten. Wooten was placed on the stand to deny this. We are of opinion, therefore, that this was a material question, and the answer was legitimate, germane and proper.

2. Bill of exceptions No. 2 recites that while Wooten, Superintendent of Public Schools of Paris, was on the witness stand, he was asked by appellant's counsel if Miss Long made a complaint to him at the schoolhouse in May, 1907, and if in reply to that complaint he did not say, "Miss Love, the teachers can complain at me about being rough at times, but they never can complain at me about matters of this kind." The State objected, whereupon appellant's counsel stated they proposed to ask the question of Miss Love Long, if she did not make complaint to Professor Wooten at that time and place and that they expected her to answer that he did make the statement to her. The point appellant was seeking to establish was to refresh Wooten's memory in order that defendant might prove by him that Miss Long did tell him of the insult offered her by deceased at the Graham schoolhouse. The court sustained the objection of the State,

and thus qualifies the bill: "Professor Wooten testified positively that Miss Love Long never made any complaint to him in May, 1907, or at any other time, of the language or conduct of Professor Jacoway towards her in her presence or of any insult offered to her by Professor Jacoway. When defendant's counsel was asked by the court to state what particular conversation between Professor Wooten and Miss Love Long they desired to introduce, they stated it was the conversation about what Professor Jacoway had said in regard to paddling the boy as long as his arm lasted, the paddle lasted, and the boy's butt lasted. That they desired to show what Professor Wooten said to Miss Love Long in regard to this language, Professor Jacoway not being present." We are of opinion there was no error in the ruling of the court in regard to this matter. The remark of Wooten to Miss Long, if made, as sought to be proved, was wholly immaterial, nor did it seem in any way to refresh the memory of the witness, for the witness denied emphatically that she had ever made any complaint to him about the insult in the dressing room. There is no merit, we think, in this bill.

3. Bill of exceptions No. 3 shows that Miss White was permitted to testify that shortly after the baby of deceased was born in March, 1907, and after the alleged insult of deceased to Miss Long in the dressing room, that Miss Long contributed something towards the purchase of the present. Objection was urged on the ground of the irrelevancy of this matter, and also that it was collateral to any issue in the case. Miss Long had denied making the contribution under the circumstances. We are of opinion this testimony was admissible as tending to impeach or throw discredit on the testimony of Miss Long inasmuch as the present was bought and Miss Long contributed to the purchase of the present prior to the time she states deceased had insulted her in the dressing room at the Graham school. It was proper to contradict and impeach her and discredit her testimony in this manner.

4. The same may be said of the testimony of a similar character set out in bills of exception Nos. 4 and 5.

5. Bill of exception No. 6 shows that while Mr. Haley, a State's witness, was testifying, he was asked by the State if Miss Long did not declare in the presence of the witness and R. L. Latimore, then county attorney, on the morning of the killing near the courthouse, that all she told her brother on Thursday night before the killing was that she had been transferred from the Graham school to the Second Ward school, and would have to go through the rain, cold and mud and eat cold lunch, and if she had known he would have taken it so seriously she would not have told him. Appellant objected to this because it was a declaration of Miss Long to Haley in the absence of defendant and was hearsay and not binding on him. Miss Long denied making such statement when she testified. This bill is qualified with this explanation: "The witness Haley testified in this connection:

The county attorney, Latimore, had asked Miss Love Long a few minutes after the killing if Professor Jacoway had ever said anything out of the way to her or insulted her, to which she said, 'no.' " Haley's testimony was clearly admissible as contradictory of Miss Long's statement, and went directly to her credit. She had testified on the stand that she had informed her brother on Thursday night of the insulting conduct in the dressing room at Graham schoolhouse where she said deceased placed his hand in her bosom.

6. Bill of exceptions No. 7 is rather lengthy, and brings in review the fact that many of the school children and some of the school teachers of the public school attended the trial or a portion of the trial of appellant, and that they were present when one of the counsel for the State was making his argument before the jury. It is also made to appear, on the part of appellant, that the children and teachers attending the trial were there by concert of action by the faculty teaching in the public school. More succinctly, it may be stated the school practically adjourned or took a recess in order that the teachers and pupils might attend the trial during the closing argument for the State. The theory of the appellant is that this was done for the purpose of influencing the jury in behalf of the State. Many of the children did attend, as well as some of the school teachers. It is urged that by reason of this fact the trial was not a fair one, and the matter was of such grave moment as would require at the hands of this court a reversal of the judgment. We are not prepared to agree to this contention under the circumstances of the case. Just how far the misconduct of bystanders or occupants of the courthouse during a trial would operate to require a reversal has not been definitely settled, and in fact is incapable of being definitely settled. Each case must depend upon its own environments. In the case of Massey v. State, 31 Texas Crim. Rep., 371, this court reversed the conviction in a rape case wherein the death penalty was assessed, but the conduct of the mob was so outrageous that it was patent in that case the defendant did not have a legal trial, and could not have had a legal trial under the circumstances, but that case is not authority here. It sometimes also occurs where a party has been convicted, the approbation of bystanders in a courthouse has been shown by applause, but as we recall, this has not been made the cause of a reversal, and would not be unless under rather extreme circumstances. We are of opinion that the mere fact that the school adjourned and attended a portion of the trial is not of sufficient moment to require a reversal.

7. There are some questions raised in regard to the manner of impaneling the jury. The State's challenge was sustained as to one juror and refused as to one or two causes for challenge interposed by appellant. It may be sufficient answer to all this that no objectionable juror sat in the case. Until this has occurred, this court will not revise the ruling of the trial court. It seems, however, that the juror Bywaters did sit upon the trial, and appellant contends that he should

have been set aside for cause. Without going into a review of the question, the court qualifies the bill in regard to this juror as follows: "The juror Bywaters answered most positively that he had no fixed opinion, had simply formed his opinion from reading the newspapers and that his opinion would not influence him if taken on the jury. He was a very intelligent man, and the court watched his answers closely while he was being examined and feel sure that he was not disqualified from serving on the jury." The bill as qualified was accepted, and no attack made upon it by appellant by bystanders and no other bill sought to be prepared. This appellant should have done if he was not satisfied with the bill given by the court, and qualified as the court did qualify it. Trotter v. State, 37 Texas Crim. Rep., 468; Adams v. State, 35 Texas Crim. Rep., 285; Suit v. State, 30 Texas Crim. App., 319; Morrison v. State, 51 S. W. Rep., 358; Vick v. State, 51 S. W. Rep., 1117. The writer of this opinion has not been in full harmony with some of the opinions written by the majority of the court heretofore, but under the cases cited there was no such error in regard to impaneling the jury as would require a reversal of the judgment.

8. There are several objections urged to the charge of the court. We have carefully examined the charge on manslaughter, and believe that it is full and fair, and submits that phase of the law favorably to appellant. Appellant's contention is that the court limited the law of manslaughter by requiring conditions which are capable of creating and do create passion such as anger, rage, and sudden resentment such as to render the mind incapable of cool reflection as adequate cause and in not limiting his charge to the single purpose of passion growing out of insult to a female relative. Under the facts of this case we do not believe appellant's contention is sound. The court instructed the jury directly that insulting words or conduct or gestures of the person killed of or concerning a female relative of the person guilty of the killing would constitute adequate cause, and further charged that in determining whether or not there was adequate cause for the homicide, the jury should consider any provocation occurring at the time of and before the homicide, and in applying the law the court informed the jury: "Although the law provides that the provocation causing the passion must arise at the time of the killing, except the provocation of insulting words or gestures or conduct to a female relative as above explained, it is your duty in determining the adequacy of the provocation, if any, to consider in connection therewith, all the facts and circumstances in evidence in the case, and if you find that, by reason thereof, the defendant's mind at the time of the killing was incapable of cool reflection," etc. We are of opinion that the charge fully protected appellant in his rights, and that the court not only gave in charge to the jury insulting conduct, words or gestures towards a female relative, but permitted the jury to take into consideration all other facts and circumstances that might have a

bearing upon it or that would enter into the matter as tending to render the mind of appellant incapable of cool reflection.

9. It is also urged as a ground of reversal that the court erred in failing to instruct the jury clearly and pointedly that if they believed from the evidence that the sister of appellant communicated to him the alleged insults by deceased to her, and that this communication occurred on Thursday night before the killing on Saturday, and he believed and acted on it, that he would be guilty of no higher offense than manslaughter, no matter what the evidence might show in regard to the insult given by deceased to his sister some eight months prior to the killing. We do not believe the court erred as urged by appellant in failing to so charge. The alleged conduct of deceased towards Miss Long, which she testified occurred in the dressing room at the Graham schoolhouse, occurred eight months prior to the homicide, but was not communicated, under her statement, to her brother until Thursday night before the killing on Saturday morning. The court did instruct the jury that if appellant killed on the first meeting after being informed of said insulting conduct, that it would be adequate cause, and under such circumstances his offense would be no higher than manslaughter. Of course, this insulting conduct could not afford adequate cause to enrage appellant's mind, under any of the testimony, until it had been communicated to him, and this occurred on Thursday night before the killing on Saturday morning. From the time he received the information until the first meeting it afforded adequate cause, but not prior to the time of its communication to him. The court gave a full and fair charge to the jury in regard to this matter, and instructed them, as before stated, that if appellant killed upon the first meeting with the deceased after the communication it would afford adequate cause, and if his mind was enraged beyond cool reflection he should be convicted of no higher offense than manslaughter. We are inclined to believe that to have selected out this one cause of insulting conduct would have been detrimental to appellant. Miss Long testified that she told her brother at the same time on Thursday night of the change from one schoolhouse to the other, and her feeling in regard to the fact that it placed her at great inconvenience in going through the mud and bad weather such a long distance to reach the schoolhouse where she was to teach, and her testimony indicates that she was outraged in regard to the matter, and that deceased had been the occasion of this change of her place of teaching, and the great inconvenience imposed on her. This entered into the case, and was entitled to some weight before the jury if they believed it. All of this conduct on the part of deceased towards Miss Long was communicated to her brother by herself at the same time, and it would have been detrimental doubtless to appellant to have culled from all this testimony and this statement of Miss Long one isolated fact of misconduct. The court was correct in sub-

mitting all of the circumstances, and would have been in error not to have done so.

10.  It is contended the court should have submitted the law of self-defense, and in this connection also that appellant would have only been guilty of manslaughter under the theory of self-defense if he beat deceased with his pistol after the deceased was shot down. We answer this, first, that self-defense was not in the case, and, second, the difficulty was unbroken and continuous, and if appellant had the right to kill under the theory of manslaughter when he fired the first shot, it would not have been necessary for the court to charge that this phase of the law would continue to operate after the deceased had been shot down. There was no question of cooling time in the case because the difficulty had not ceased. The shots were fired during the struggle, the parties fell and appellant then beat deceased with his pistol. There was no intermission in the difficulty, and self-defense being out of the case, manslaughter from this standpoint could not be in the case.

11.  It is contended the evidence is not sufficient to justify the conviction of murder in the first degree. While there may be some question that the condition of the mind of appellant was such that the killing was upon express malice and cool deliberation, yet there are facts sufficient perhaps for the jury to have formed this conclusion. To the mind of the writer, it would have been more satisfactory had the conviction been for a milder punishment. However, these matters were before the jury, and we do not feel authorized, under the circumstances, to disturb their finding.

Therefore the judgment is ordered to be affirmed.

*Affirmed.*

McCord, Judge, not sitting.

ON REHEARING.

April 19, 1910.

DAVIDSON, PRESIDING JUDGE.—On a former day of the present term the judgment was affirmed. Appellant has filed a motion for rehearing, urging errors in that opinion. We have carefully reviewed the questions suggested for reversal, as set out in the former opinion, and still think that the matters were correctly decided.

There is some complaint in the motion for rehearing that the court was not exactly accurate in two statements of the record. In the general statement of the evidence, in the original opinion, among other things, it was stated that Miss Long testified that after the insulting conduct of deceased towards her at the high school building she told Professor Wooten, Superintendent of the Public Schools of Paris, of this insult, and Wooten replied: "Miss Love, my teachers may criticise me at times about being a little rough, but they can never say

that I did anything like that." An inspection of the testimony of Miss Long seems to bear out the statement of appellant that she did not make this statement to the jury. It came up in a bill of exceptions. We were aware, as a matter of course, that Professor Wooten was not permitted to so testify, for a bill of exception was reserved to the court's refusal to permit him to make a statement in regard to that matter. It seems that appellant is correct in this criticism of the statement of the evidence in the opinion, but it is a matter of no moment, and is referred to because of the criticism of the opinion in the motion for rehearing.

It is also contended there is another incorrect statement in regard to the bill of exceptions reserved to the ruling of the court impaneling the jury. The opinion states that the juror Bywaters sat upon the trial of the case. An inspection of the bill of exceptions and the whole record in regard to this matter will indicate that this may have and doubtless did arise by the writer in dictating the opinion calling the wrong name. The juror who sat upon the trial was Camer. This is a matter of indifference and of no importance, and had no effect upon the conclusion reached. Reference is made to these matters simply to make the opinion speak literally the truth as to the matters indicated and to meet appellant's criticisms. We are of opinion, however, there was no error in regard to impaneling the jury. The bill of exceptions, as stated in the original opinion, shows there was no objectionable juror taken on the trial. The bill, in regard to this particular matter, as explained by the court, recites the following: "That the defendant did not challenge the juror W. E. Camer for cause or peremptorily; they asked him no questions and had heard his answers to the State's counsel and said nothing whatever except after the State had accepted the juror one of the defendant's counsel said: 'We except to this juror for the purpose of preserving exceptions heretofore made to jurors, but we do not except personally to him.'" In view of this statement of the court, the juror Camer was not objectionable, legally speaking. Therefore, we are still of opinion that the statement in the original opinion is correct, that no objectionable juror sat upon the trial of the case.

There is a question presented in motion for rehearing as an original proposition, not having been set up prior to the filing of the motion for rehearing. It is contended, as an original proposition on the rehearing, inasmuch as the Hon. Felix J. McCord, one of the members of this court, entered his disqualification in this case, that the decision is erroneous and void because two members of the court could not constitute such a quorum as was authorized to render the opinion or adjudicate the case. We are of opinion that this question should be decided adversely to appellant. In the case of City of Austin v. Nalle, 85 Texas, 520, this question was decided by the Supreme Court of our State adversely to appellant's contention. In that case it is shown when the case was appealed to the Court of Civil Appeals, sitting at

Austin, that Judge Key, a member of that court, entered his disqualification, the two remaining members of the court decided the case, and on writ of error it was taken to the Supreme Court. It is unnecessary to go into a long discussion of the matters involved in that opinion. Judge Gaines, then Associate, but now Chief Justice, of the Supreme Court, rendered the opinion. After comparing original section 11, article 5, as found in the Constitution of 1876 with the present section 11 of said Constitution, the opinion recites:

"In brief, the former says, that when any two members of the court are disqualified the Governor shall commission the requisite number of lawyers to try and determine the cause; the latter provides that he shall appoint the requisite number if but one member of the court be disqualified. Upon first blush the literal terms of the amendment would seem to demand, and the fact of the change would indicate that in any case in which a judge was recused a special judge should be appointed. But this construction, when the section in question is compared with other provisions in the amendment, leads to a manifest incongruity.

"We should bear in mind that section 11 applies in express terms to the Supreme Court and to the Court of Criminal Appeals. The amendment, in terms equally clear, provides that two members of either of these courts shall constitute a quorum. So that if it should be held that the Governor should appoint a special judge in every case in which a member of either of these two courts should be disqualified the remaining two could not act, although they could make a decision if that member was merely absent, or saw fit from any cause not to take part in the decision of the case.

"No reason suggests itself to us for such a distinction. Why, if two members of the court make a quorum, should a third be appointed in a case in which the two may concur in a decision? There can be none. But there is a necessity for an appointment when the two judges who are qualified may disagree.

"This suggests the consideration which, as we think, led to the change in the section under consideration. Under the original section a special judge could be appointed only when two members of a court were disqualified; and hence there was no provision to meet the case when one was disqualified and the other two failed to concur as to the decision of the case. The amended section obviates this difficulty by providing for an appointment when only one is disqualified.

"It does not follow that an appointment is to be made in every such case. The requirement is that the Governor 'shall commission the requisite number . . . for the trial and determination of such cause.' If three were required to make a quorum, then one being disqualified, another would be necessary to make the requisite number to decide the cause. So also, if one be disqualified and the other two disagree, the appointment of a special judge is requisite to enable the court to make a decision, although two may constitute a quorum. But

if two be a quorum, and two be qualified and able to agree, no additional judge is requisite to a decision of the case, although the third member of the court be recused.

"So construed, we see a satisfactory and sufficient reason for the change made by the amendment. Construed as requiring the appointment of a special judge in every case in which one member of either of the courts is disqualified, we perceive no sound reason for the departure from the previous law. Though not strictly repugnant to those provisions which make two members, either of the Supreme Court or of the Court of Criminal Appeals, a quorum to transact business, such a construction does not accord with their spirit.

"We, conclude, therefore, that the disqualification of Judge Key did not make requisite the appointment of a special judge, and that the court composed of his two associates constituted a lawful tribunal for the trial and determination of the case."

That case has been followed in Holt v. Maverick, 86 Texas, 457; Gwin v. O'Daniel, 85 Texas, 563; Railroad Co. v. Adams, 25 S. W. Rep., 639. This seems to be the rule in other States under provisions of the Constitution similar to our Texas Constitution. The question as to the number of judges required to be present and necessary to authorize the legal transaction of business by a court, as a general rule, is to be determined from the constitutional or statutory provisions creating and regulating courts. The number varies in different jurisdictions, but as a general rule a majority of the members of a court is a quorum sufficient for the transaction of business and the decision of cases. In the absence of a quorum or the number required by law to hold court, a judgment rendered by the remaining judges would be regarded as a nullity, because in such case there would be no authority in the court to render the judgment. In support of the above we would cite Trice v. Crittenden County, 7 Ark., 159; Ferguson v. Crittenden County, 6 Ark., 479; Jagger v. Coon, 5 Mich., 31; Coffin v. Hussey, 12 Pick., 289; Engle v. State, 50 N. J. L., 272; McFarland v. Crary, 6 Wend., 298; Kilpatrick v. Com., 31 Pa. St., 198; Commonwealth v. Martin, 2 Pa. St., 244; Steele v. Blanton, 1 Lea, 514; Austin v. Nalle, 85 Texas, 520; West v. Burke, 60 Texas, 51; State v. Bradley, 67 Vt., 465.

It may be further stated that the effect which the death, disqualification or absence of a judge may have upon the authority of remaining judges to hold court and transact the business of the court, must depend upon the provisions of the Constitution and statutes in reference to the courts. As a rule, the death, disqualification or the absence of a judge will not deprive the surviving or remaining judges of authority to hold court and transact the business of the court, and in fact to exercise all functions pertaining to the particular court, provided, however, that the number of the court is not reduced below that legally required for the transaction of its business. The above seems to be universally correct. It was held in New York that the

death of one of three judges does not deprive the surviving two of the power to hold court. Campbell v. Seaman, 63 N. Y., 568. So it was held in North Carolina, State v. Lane, 26 N. C., 434. Such is the rule as well in South Carolina, Aultman v. Utsey, 35 S. C., 596. Again, it has been held that where one of the judges is disqualified from sitting, the remaining judges may hold court. Nalle v. Austin, supra; Western Union Tel. Co. v. McLeod, 24 S. W. Rep., 815; Oakley v. Aspinwall, 2 Sandf. (N. Y.) 7; People v. Davis, 61 Barb. (N. Y.) 456; McLughan v. Bovard, 4 Watts (Pa.), 308. It was also held in South Carolina that in case of a vacancy in office the remaining judges may act. Sullivan v. Speights, 14 S. C., 358. It has also been held that the absence of a judge may not deprive the court from acting. Pedrieau v. Hunt, Riley Eq. (S. C.), 75. So, in the absence of a judge of a special court commissioned by the Governor has been held not to invalidate proceedings held by the other two. Goodman v. Walker, 29 Ala., 444. The temporary absence of one of the members necessary to make a duly organized court does not impair the validity of the court's proceedings. People v. Dohring, 59 N. Y., 374; Tuttle v. People, 36 N. Y., 431.

We deem it unnecessary to pursue this matter further, as the courts of the United States seem to be practically of one mind in regard to the decision of the question here involved. The reasoning of Judge Gaines in the case of City of Austin v. Nalle, supra, places the decision of this question upon correct grounds, and we are of opinion that his reasoning is unanswerable and ought to settle the question.

We are of opinion, after carefully reviewing appellant's motion for rehearing, that it should be overruled, and it is accordingly so ordered.

*Overruled.*

McCord, Judge, not sitting.