No. 8328.

MOUNTAIN STATES TELEPHONE & TELEGRAPH COMPANY v.
THE PEOPLE EX REL.

1. QUO WARRANTO—By Private Relator.  Under license from the city
    the defendant had, at great expense, constructed a line of tele-
    phone occupying with its structures the public streets.  The
    city had accepted and was still accepting valuable services from
    defendant, and had taken no step to revoke the license.  Held
    that a private citizen was not entitled to quo warranto to oust
    defendant of the franchise, especially as the municipality had
    the power of revocation, and the like power was vested in the
    inhabitants through the initiative.

2. SUPREME COURT—Quorum.  A majority of the judges constitute the
    quorum of the court.

3. ——Majority of the Quorum.  The judges constituting a majority
    of the quorum may speak for the court in the decision of any
    case.

On the first question Garrigues, C. J., and Burke, J., concur, Allen,
    J. and Denison J. not sitting.

On the last question Garrigues, C. J., and Allen, Burke and Denison,
    J. J., concur; Scott and Teller, J. J., dissenting on both prop-
    ositions.

*Error to Denver District Court, Hon. John H. Denison,
Judge.*

Mr. MILTON SMITH, Mr. CHARLES R. BROCK, Mr. W. H.
FERGUSON, Mr. ELMER L. BROCK, Mr. JOSEPH SAMPSON and
Mr. FLOYD F. WALPOLE, for plaintiff in error.

Mr. JOHN A. RUSH, District Attorney, Mr. WILLIAM E.
FOLEY, District Attorney, Mr. WAYNE C. WILLIAMS and
Mr. OMAR E. GARWOOD, for defendant in error.

Mr. Justice Bailey delivered the opinion of the court.

THE action is in *quo warranto*, brought by the People
on relation of O. Clinton Wilson acting in a purely private
capacity, having admittedly no interest other than such as
is common to all taxpayers in the community, to oust the

defendant from an alleged exclusive franchise right or privilege to occupy the streets and alleys of the City and County of Denver for the purpose of giving telephone service. The complaint was amended by striking out the word "exclusive" before the words "public franchise right or privilege."

A demurrer to the amended complaint was interposed upon two grounds: (1) That the relator shows no right whatever to maintain the action, and (2) That the complaint as amended does not state facts sufficient to constitute a cause of action. This demurrer was overruled, and the defendant answered.

To the answer the relator filed a replication, the first paragraph of which contained a general demurrer. The case was heard upon such demurrer. The defendant sought to have the demurrer carried back to the complaint as amended, but the court denied that request, and sustained the demurrer to the answer. Thereupon the defendant elected to stand by its pleadings and cause as made, and final judgment, not of ouster from the exercise of an exclusive privilege, but an absolute and unconditional ouster from the streets of the city was entered. On this record the defendant brings the case here for review. It will be observed, therefore, that the issues involved, to which the assignments of error are directed, are of law only.

The answer sets forth in addition to many other claims and defenses, certain specific matters, which tend to establish that the complaint fails to state facts sufficient to constitute a cause of action, that question having been raised, in the first instance, by demurrer to the complaint. Upon such demurrer it was argued that the right to maintain this action in any event, did not and could not exist until the duly constituted city authorities had taken appropriate action to terminate and revoke the license to the defendant to be in its streets and alleys, the existence of which license the complaint admits.

The facts thus stated in the answer, the truth of those which are material and well pleaded being admitted by the demurrer, are in substance:  That since 1879 the defendant, and its predecessors in interest, have occupied the streets and alleys of the City of Denver, with its telephone lines and equipment, under the formal written permission, and by and with the consent of the duly constituted official authorities thereof, subject always to reasonable police control and proper general regulation.  That under such license the defendant company, and its predecessors in interest, constructed its plant within the city limits, at a cost of approximately four millions of dollars, that such plant is a vital and integral part and parcel of an interstate system, extending into and throughout the States of Colorado, New Mexico, Idaho, Utah, Texas, Wyoming and Arizona, constructed at a cost of approximately thirty-six millions of dollars, and of that value, which, if this company is compelled to abandon its Denver connections, would not only be greatly damaged and impaired, but practically destroyed.  That just presently before the commencement of this action the defendant had expended over a million dollars in placing underground within the city certain of its lines, under the supervision, upon the authority and by order of the city officials.  That as a consideration for such license to so use its streets and alleys, the city had demanded, and at all times had received, for its public business and for the use of certain of its officers, partially free telephone service.  That the city had permission, at all times and without charge, to string and operate its fire alarm and police wires upon the poles of the defendant, so erected in the city, has done so and still continues to do so.  That there never has been an attempt in any way, or at all, by the duly constituted authorities, or by any one whomsoever, to annul, terminate, set aside, alter, withdraw or revoke such license, and that the same is now and at the time of the commencement of this suit was, and still continues to be in full force and effect, and is so recognized, acknowledged, acquiesced in and acted upon by the muni-

cipality, which is now receiving and accepting from the defendant telephonic service. That from time to time improvements upon, additions to and extensions of the plant of the defendant have been made with the consent and approval of the city, under its general regulation and police inspection. That the major portion of such improvements, additions and extensions, so as aforesaid made, have been so made within the twelve years next preceding the commencement of this action.

It is thus shown that the defendant had a license from the city to construct a telephone plant, which has been constructed, is being operated and public service being given. In view of the fact that there has been expended, in the construction, additions and extensions of the plant a vast sum of money, that the city has consented to such construction, additions and extensions, has permitted the operation of such plant, has accepted, and still is accepting, valuable considerations for extending such privileges, is still receiving service therefrom, and has taken no step to revoke the license under which the company operates, it would be illogical and unreasonable to hold that a private individual, with no interest other than such as is common to every taxpayer in the municipality, could, under such circumstances, maintain an action of absolute ouster against it. This becomes the more apparent when it is considered that the municipality, through its legislative authorities, has power to revoke licenses, and that a like power is vested in the people, as a whole, through the initiative to bring before the electorate ordinances revoking licenses, with full authority in the voters to give expression through the ballot, to their will on the subject.

By these acts of regulation, supervision and control through its proper officials the City and County of Denver has and does recognize the right of defendant to continue in its streets and in effect requires and demands such continuance.

Under the allegations of the answer, and there is no dispute as to the facts, it seems clear that the telephone

company, being in the streets by permission of those having power to extend such privilege, is not a trespasser, and that no action in *quo warranto* could, under such conditions, be maintained. Without regard to the duration or extent of the right of the telephone company to occupy the streets and alleys of Denver, which we neither consider nor determine, upon authority it is plain that it has such right, so long as the city, in the exercise of jurisdiction, accepts service from it, fails to revoke or attempt to revoke its right to be in its streets, and assumes generally to regulate and control its course of conduct.

In support of this proposition we direct attention to section 1315 of Volume 3, 5th edition of Dillon on Municipal Corporations, where that learned author said "If the city continues to accept a service of water or light from the company and regulates the rates therefor, this gives implied consent to the continued possession of the streets and operation of the works until such time as the city shall, by reasonable notice, see fit to determine the corporation's tenure of the privileges."

*East Tennessee Telephone Company v. Board of Councilmen,* 141 Ky. 588, 133 S. W. 564, is a case in which the Kentucky Court of Appeals expressly ruled that, although the company's right to be in the streets could be terminated, that the right, nevertheless, continues until duly withdrawn. At page 591 of that opinion, the court said: "The council has not yet revoked the permission, and until it is revoked the grantee is rightfully in possession."·

The principle of these authorities was recognized by this court in *Denver Tramway Company v. Londoner,* 20 Colo. 150, and also in *Board of Public Works v. Denver Telephone Company,* 28 Colo. 401, 37 Pac. 723. The answer discloses that the city has accepted and continues to accept, service from the company, and has regulated its affairs in such a way as to bring the case definitely within the rule laid down by Dillon, supra, particularly since its right to be in the streets, as appears from such answer, has never been revoked. It is clear, therefore, that when

this suit was brought no cause of action for ouster had accrued in behalf of anyone, and that a judgment of dismissal, without prejudice, should have been rendered by the trial court.

If there has ever been any doubt as to the propriety and soundness of this proposition, it has been finally set at rest by two late decisions of the United States Supreme Court, one the *City and County of Denver v. Denver Union Water Company*, 246 U. S. 178, 62 L. Ed. 649, 38 Sup. Ct. 278, and the other *The Detroit United Railway v. City of Detroit*, 248 U. S. 429, 63 L. Ed. 341, 39 Sup. Ct. 151. In both cases it was conceded that all street rights had terminated, and that the municipalities in question were free to proceed with ouster suits against the respective utilities. Instead of doing this the municipalities undertook to still regulate the conduct of the business of these companies within their borders and by so doing, the United States Supreme Court, declared, made it lawful for the utilities to continue in the use and occupation of such streets and alleys. These decisions definitely support the contention that this action is premature.

In the Denver Union Water Company case, although the franchise term had expired, and although that fact had been judicially declared, thereafter the City and County of Denver enacted an ordinance regulatory of the rights and privileges of that company. At page 188 of the opinion, the effect of such an ordinance is discussed, in the following terms: "The practical situation existing at the time of its enactment (referring to the enactment of the regulatory ordinance) is sufficiently clear from what has been said. The answer admits the averment of the bill that complainant has been and is compelled to continue to serve the city and its inhabitants with water, because there is no other supply of water available, and a cessation of its service would result in great suffering, damage and loss of life. The city is located in a semi-arid region, and is and for nearly a half century has been, absolutely dependent upon the continued operation of complainant's system.

The termination of the legal franchise in 1910 did not absolve the city from its duty to the inhabitants. At the time of the enactment of the ordinance of 1914, the company's plant had been in use for four years since the expiration of the former franchise, * * *.

"It is in the light of all these circumstances that the provisions of the ordinance of 1914 must be read. There is a preamble reciting that since 1910 the company had been without franchise and a mere tenant by sufferance of the streets, and that, while it had been supplying the city and its inhabitants with water, it had done so 'at rates that are excessive and that should be reduced and regulated accordingly'; and there is a declaration that the enactment is made without recognizing the company's right to occupy the streets or to continue its service, but for the purpose of regulating and reducing its charges 'during the time it shall further act as a water carrier and tenant by sufferance of said streets.' But the enacting provisions, in the terms employed and by necessary intendment, are inconsistent with these declarations, and must be taken to override them. The first section establishes, as the maximum charges permitted to be made by the company, a detailed schedule of '*semi-annual* water rates payable *in advance* on the first day of May and November of *each year.*' The various uses are specified, and many of these are of kinds that cannot be discontinued on brief notice. There is a special rate for irrigation by the season, May 1 to November 1. There is a provision for meter rates, payable monthly, with a clause requiring the company to instal a meter for any person desirous of using water by meter. Section 2 provides that for hydrants, including 'those which may *thereafter* be ordered by the council to be set upon existing mains or upon *extensions* thereof', the city shall pay *annual* rentals. And § 4 imposes fines upon the company and its agents for any violation of the ordinances.

"Of course, these provisions are of themselves inexplicit; but in attributing a meaning to them the choice is between a liberal construction that preserves the substantial rights

of both parties and a strict construction, highly penal and destructive in its effect upon both. The subject-matter was a prime necessity of life, for which there was no substitute available. The very act of regulating the company's rates was a recognition that its plant must continue, as before, to serve the public needs. The fact that no term was specified is, under the existing circumstances, as significant of an intent that the service should continue while the need existed as of an intent that it should not be perpetual. Without attributing to the initiators and to the city council a purpose to subject the inhabitants to grave danger of disease or worse, we cannot read the enacting provisions as leaving the company actually without the right to maintain its plant in the city thereafter, for necessarily this would leave it at liberty to discontinue the service at will. The alternative, which we adopt, is to construe the ordinance as the grant of a new franchise of indefinite duration, terminable either by the city or by the company at such time and under such circumstances as may be consistent with the duty that both owe the inhabitants of Denver. It recognizes the dependence of the city upon this plant; by necessary implication confers upon the company whatever privileges may be necessary to enable it to continue serving the public, in effect requires it to furnish water, and in terms prohibits it from exceeding the specified rates." *    *    *

The doctrine of the Denver Union Water Company case was again announced in the Detroit case. In that case the franchise right in certain streets had expired. There was no dispute upon this point. Still the municipality sought to regulate the conduct of the business of the railroad company within the city limits, including the business of the company over and through streets upon which it had no franchise, and upon such facts the United States Supreme Court said: "A principal ground upon which the bill was dismissed by the district court was the view of the learned judge that the power to compel the company to remove its tracks from the streets involving the non-franchise roads included the right to fix terms of con-

tinued operation upon such lines, whether remunerative or not. We cannot agree with this view. In our opinion the case in this respect is ruled in principle by *Denver v. Denver Union Water Co.*, 246 U. S. 178. In that case the franchise of a water company had expired, and the city might have refused the further use of the streets to the company. Instead of doing this it passed an ordinance fixing rates and requiring certain duties of the company. We held that in that situation the company was entitled to make a reasonable return upon its investment. So here, the city might have required the company to cease its service and remove its tracks from the non-franchise lines within the city. Instead of taking this course the city enacted an ordinance for the continued operation of the company's system, with fares and transfers for continuous trips over lines composing the system whether the same had a franchise or not. This action contemplated the further operation of the system, and fixed penalties for violations of the ordinance. By its terms the ordinance is to continue in force for the period of one year, unless sooner amended or repealed. This was a clear recognition that until the city repealed the ordinance the public service should continue, with the use of the streets essential to carry on further service. Within the principles of the Denver case this service could not be required without giving to the company, thus affording it, a reasonable return upon its investment. In the Denver case we said: 'The very act of regulating the company's rates was a recognition that its plant must continue, as before, to serve the public needs. The fact that no term was specified is, under the existing circumstances as significant of an intent that the service should continue while the need existed as of an intent that it should not be perpetual.'

"In the present case the service upon the terms fixed in the ordinance is continued for a year, the city reserving the right to repeal the ordinance at any time.

"It is clear that the city might have taken a different course by requiring the company to remove its tracks from

the non-franchise lines; it elected to require continued maintenance of the public service, doubtless because it was believed that it was necessary in the existing conditions in the city to continue for a time at least the right of the railway company to operate its lines. This amounted to a grant to the company for further operation of the system, during the life of the ordinance."

The foregoing authorities hold, in effect, that before ouster proceedings against the telephone company can be maintained, the city must abandon its powers of regulation over it, or at least decline to exercise them, and revoke or attempt to revoke, by proper legislative action, the right of the company longer to continue in its streets, and decline to accept service from it.

The judgment is reversed, and the cause remanded, with directions to dismiss the proceeding, without prejudice to the rights of all concerned.

Decision en banc.

Mr. Chief Justice Garrigues and Mr. Justice Burke concur.

Mr. Justice Scott and Mr. Justice Teller dissent.

Mr. Justice Allen and Mr. Justice Denison not participating.

Mr. Justice Allen and Mr. Justice Denison decline to participate in the decision, each having decided questions involved at nisi prius, Mr. Justice Denison having tried the cause finally. It therefore becomes necessary to determine what number of judges constitute the Supreme Court en banc, and how many must participate to decide a case.

Section 5 of Article VI of the Colorado Constitution reads: "The Supreme Court shall consist of seven judges, who may sit en banc, or in two or more departments as the court may, from time to time, determine. In case said court shall sit in departments, each of said departments shall have the full power and authority of said court in the determination of causes, the issuing of writs and the exercise of all powers authorized by the Constitution, or provided by law, subject to the general control of the court

sitting *en banc*, and such rules and regulations as the court may make, but no decision of any department shall become the judgment of the court unless concurred in by at least three judges, and no case involving a construction of the Constitution of this State or of the United States, shall be determined except by the court *en banc.*"

Section 8 of Article VI provides: "The Chief Justice shall preside at all sessions of the court *en banc,* and, in case of his absence, then the judge present who would next be entitled to become Chief Justice, shall preside."

This section also provides that the judge having the shortest time to serve, not holding office by appointment or election to fill vacancy, shall be the Chief Justice, and of the two judges whose terms of office expire upon the same day, the younger in years of the two judges shall be the Chief Justice during the next to the last year of his term of office.

From these sections of the Constitution it will be noted that provision is made for the court to sit in either of two ways: In departments, or *en banc.* The number of departments may be two or more, but no decision of a department shall become the judgment of the court unless concurred in by at least three judges.

It is unnecessary to enter into a mathematical determination of the different combinations that would be possible for the creation of departments. Whatever the number of departments, or the number of judges constituting a department, there must be a concurrence of at least three judges for a department decision. There may be two departments, each composed of the Chief Justice and three other justices, or, according to the present arrangements, there may be three departments, each composed of the Chief Justice and two other justices. In either case, as already stated, three judges must concur in order to render a decision. In the one case three of four judges may render a court judgment, and in the other all three of the judges constituting the department must concur. Speculation might be indulged as to why the concurrence of three

judges is required, and it might be urged that the number fixed is that number which would be the minimum majority of a minimum quorum of all the judges when sitting *en banc*.

· Under this view it would follow that, when the court sits *en banc*, the least number of judges which could constitute a quorum is four, and a majority of the four—that is, three judges—must concur in order to render a judgment of the court *en banc*. However, unless inference be drawn from what is said of the power of the department of the court and the number of judges necessary to a decision, the Constitution is silent upon the subject as to the number of judges required to constitute the court *en banc*. We say it is silent. This is true in so far as any express statement of the minimum number of jurges constituting the court *en banc*, is concerned. It is perfectly clear, however, that the court *en banc* may be composed of less than all the judges, since it expressly declares that the Chief Justice shall preside at all sessions of the court *en banc*, and in case of his absence, then the judge present who would be next entitled to become the chief justice shall preside. Now, if the Chief Justice is absent because, for example, personally interested in the case or because he feels himself disqualified, then the judge present who would next be entitled to become Chief Justice, shall preside. If that judge is also absent, the inference is irresistible that the next judge *present* who would be entitled to become Chief Justice shall preside and there is no limit fixed by the Constitution as to how many judges might thus be absent.

Under a constitutional provision such as ours, a majority of the members of the court constitute the court *en banc*, and a majority of the court as thus constituted, of course may decide. Cases which directly sustain this principle are: *Oakley v. Aspinwall*, 3 N. Y. 547; *State v. Lane*, 26 N. C. 434; *Commonwealth v. Mathues*, 210 Pa. 372, 59 Atl. 961.

There is an old statute in this state, carried forward and found as section 1412 of the Revised Statutes of 1908,

which provides: "If there shall not be a quorum of the justices of the supreme court present on the first day of any term, the court shall be and stand adjourned from day to day until a quorum shall attend." * * *

This statute clearly determines, that which is necessarily implied in the constitutional provision, that a *quorum* of the justices may transact business and decide cases. The statute does not define a quorum. The word, therefore, must be held to be used in its ordinary meaning, and that meaning is a majority of the entire body. *Decker v. School District No. 2,* 101 Mo. Appeals 115, 74 S. W. 390; *Ex Parte Willocks,* 7 Cowan 402, 409, 17 Am. Dec. 525; *Zeiler v. Central R. Co.,* 84 Md. 304, 35 Atl. 934, 34 L. R. A. 469; *Snider v. Rinehart,* 18 Colo. 18, 31 Pac. 716.

The necessary and inevitable inference from the constitutional provision as to who shall preside over the court *en banc,* when the Chief Justice is absent, is that the court *en banc,* may consist of a less number than all the judges. If not equally divided, the inference is also irresistible that a decision may be made according to the views of the majority of the members of the court sitting.

The opinion in the famous "Telephone Cases" decided by the Supreme Court of the United States in 1888, the report of which fills the entire volume of 126 U. S. Reports, is illustrative of the power of a majority of a quorum to decide. These great cases were argued before the Supreme Court of the United States on January 24, 25, 26, 27, 28, 31, and February 1, 2, 3, 4, 7 and 8, in the year 1887. At the time of the oral argument the Supreme Court was composed of Chief Justice Waite and Justices Miller, Field, Bradley, Harlan, Woods, Matthews, Gray and Blatchford. Mr. Justice Gray, however, was not present at the argument, and for that reason took no part in the decision, and Mr. Justice Woods, by reason of illness, did not sit at the argument, and died April 14, 1887, before the cases were decided. Mr. Justice Lamar was appointed to fill a vacancy caused by the death of Mr. Justice Woods, and was sworn in on January 18, 1888, but, not having been a member of

the court when the cases were argued, took no part in the decisions. Only seven members of the court, therefore, participated. There were Chief Justice Waite, and Justices Miller, Field, Bradley, Harlan, Matthews and Blatchford. The opinion of the court was delivered by Chief Justice Waite, and was concurred in by Justices Miller, Matthews and Blatchford, with Justices Field, Bradley and Harlan dissenting. The decision was rendered by a majority of a quorum only, which number was not a 'majority of all the members of the court.

Upon the theory that a majority of the court constitutes a quorum, and this seems to be incontrovertible, we are of opinion that a majority of such quorum has full power to hear and determine any cause. Even upon this assumption three judges at least must concur in order to reach a final determination, just as that number is required in a department to finally decide. Any other rule might often completely paralyze and render impotent one branch of the State Government, a situation which is simply unthinkable.

Upon the question of how many judges constitute the court *en banc* and how many may decide a case, in which all the members of the court take part, the Chief Justice, Justices Allen, Burke and Denison concur. Justices Scott and Teller dissent.

Mr. Justice Teller dissenting: According to the majority opinion, the defendant is lawfully in the streets of Denver, not because it has a perpetual franchise to use them, as defendant claims, but because from the city's dealings with it, a license is implied to use said streets. From the facts of this license, it is concluded that, until it is revoked by the city, a proceeding in the nature of *quo warranto* to question the defendant's rights to occupy the streets may not be prosecuted. With so much of the opinion as appears to hold that the defendant has no franchise from the city, I heartily concur; but I cannot agree that the action was prematurely brought; or that it was not properly begun by the District Attorney on the relation of a citizen taxpayer.

The conclusion that the writ will not lie until the city

orders the defendant from the streets, results, in my opinion, with due deference to my associates thus concluding, from a misapprehension of the ground of the proceeding.

The statute makes it the duty of the District Attorney to bring the action "whenever he has reason to believe that any such office or franchise has been usurped, intruded into, or unlawfully held." If, then, the District Attorney is of the opinion that a franchise is being unlawfully held, either by reason of the fact that the party has no franchise at all, or an alleged franchise which he deems invalid, his duty is to begin proceedings to determine such right. He is not required to wait until someone else acts. If the defendant had a license, that fact would not militate against the right of the state to determine whether or not the company is now lawfully in the streets of the city. Beyond doubt the state has the right to have determined the question of the authority of any person or corporation to occupy streets under a claim of right, whether based upon an alleged franchise or a supposed license. If there be a franchise or license the proof thereof is a matter of defense. Were the inquiry by the city, a different question might be presented, it not being at liberty to deny the validity of the license which it had assumed to grant.

It must not be forgotten that this is an action by the state in its sovereign capacity, acting through the District Attorney, who is specifically authorized by statute to act for the state in these matters. The state is the principal and the city the agent, and if the agent—the agency being special and limited—exceeds its powers, the principal is not bound by such acts. The defendant, having obtained, as it claims, through the city, rights which only the state can grant, either mediately or immediately, clearly the state need not wait for the city to take action to test the question whether or not there has been a valid grant of those rights. If the state must thus wait for action by the city, the latter might exercise any powers it chose to assert, and its subsequent refusal to question its own action would

leave the state powerless in the premises. That would effectually nullify all limitations on the powers of the city, and render unnecessary any consideration of what powers had been granted to it. This view is in accord with both reason and authority.

In *State v. Railway Co.*, 135 Iowa, 694, 109 N. W. 867, the court said: "It is a thoroughly well-established proposition that rights granted to a corporation, either directly or by the State indirectly through the act of a minor municipality authorized by the State, are to be regarded as franchises no less than is the right to be a corporation. Both classes of rights are derived mediately or immediately from the State, and both are subject to the inherent power of the State to guard against their abuse by the grantee or usurpation by a wrongdoer."

Again, speaking of the privilege of using city streets, the court said: "The municipality to which is given authority to grant such a privilege exercises a delegated power only, and it cannot grant to any person or corporation a privilege which is confessedly in derogation of the common right, in a manner which shall exclude the power of the State to inquire into its abuse, or to prevent the subversion of the public interests which the legislative grant was intended to promote."

And again: "To say that the State has surrendered to the city all its power and authority to protect public interests against usurpation, neglect, or abuse by a corporation of its own making, and that so long as the city authorities are content to remain quiescent the State is powerless in the premises, is to say that the State may surrender its sovereignty and the Legislature estop itself by an abdication of its legislative power. Even the State itself cannot constitutionally authorize the occupation of the street for anything but a public purpose, and if a city government by its indifference to public interests or by a mistaken estimate of its own power in the premises permits a corporation to occupy its streets without legal right to such franchise or to assume without authority other rights

which are not common to the people generally, the State has the inherent and reserved right to call upon such corporation to show by what warrant it assumes to hold or exercise such franchise.   The right and power of the State over its highways, roads, and streets and its duty to preserve and protect these avenues of public travel against unlawful encroachment and obstruction are as wide as its territorial jurisdiction."

Counsel for plaintiff in error say that it should ever be borne in mind that the right to use the streets is derived from the state; yet they deny that the power that grants the right may inquire whether or not the use of a street is under a grant, or in accordance with one admitted to have been made.   I confess my inability to follow counsel's reasoning.   Since, then, the state can inquire as to the acts of its agent, whenever it appears that the public interest requires such inquiry, it can never be said that such inquiry, as to acts fully performed, is premature.   It would seem that, after it was ruled that the proceeding was prematurely begun, no consideration of other questions argued was necessary.

The opinion, however, determines that under the circumstances recited, a private citizen, with no special interest involved, may not maintain an action of ouster; this, especially, it is said, because the city may, at any time, revoke licenses.   This overlooks the statute which specifically authorizes the District Attorney to bring such a proceeding in the name of the state, on the relation of a private party.   It is in no sense a private action.   The relator, as in many other proceedings, merely acts, under statutory authority, or by established practice, to set the machinery of the law in motion.   This proceeding is no more the private suit of the relator, than would be a prosecution under an information, as a basis for which he made the necessary affidavit.   As well might it be said that a proceeding for constructive contempt is private, because it is initiated by the affidavit of a private party.

In *State ex rel. v. Railway Co., supra,* objection was made that the relator, a private citizen, could not institute the proceeding, as is here contended. The court there points out that the purpose of the proceeding is to protect the public interest, and that the relator acts not for his private interest, but to set the machinery of the law in motion to vindicate the interests of the public.

The majority opinion refers to statements in the answer which, it is said, "tend to establish that the complaint fails to state facts sufficient to constitute a cause of action." Then follows a recital of the allegations which are presumably, the ones which discredit the complaint. This criticism of the complaint ignores our recent ruling, by the full bench in *Lockhard et al. v. The People ex rel. Weisbrod,* 65 Colo. 558, 178 Pac. 565. We there held that the complaint in *quo warranto* may be general in its terms, "alleging facts showing capacity to institute the action, and directly charging acts which show an intrustion into or the usurpation of an office, or franchise." We said: "The rule is that the state has no burden to assume in the first instance. The complaint or information is a challenge to the defendant to show by what right he is exercising a franchise or holding an office." The ultimate fact to be alleged in this case was that the defendant was exercising a franchise without right. *People v. Reclamation Dist.,* 121 Calif. 522, 50 Pac. 1068, 53 Pac. 1085. The attack on the complaint is, therefore, without basis.

The reversal of the judgment on the ground that the defendant has an implied, revocable license is without any support whatever in the record. The answer sets up, not that the city has done things from which a license to the defendant is implied, but that the defendant has from the constitution and the statutes a perpetual franchise, which neither the city nor the state can revoke, i. e., a contract with the state, which is protected from abrogation by the federal constitution. This claim to a perpetual franchise is repeated again and again, and nowhere in the record is there a suggestion that a right is claimed under an im-

plied license.   The argument for plaintiff in error follows the same line.

It is true, of course, that a plaintiff may recover upon any right of action fairly stated in his complaint, and possibly, by a liberal construction of the allegations of the answer, the matter of an implied license might have been considered; but it is equally true that a party cannot try his cause on one interpretation of his allegations in the trial court, and change the theory of his case and obtain relief in a reviewing court on a new interpretation.

Counsel claim a franchise under section 13 of Article XV of the Constitution of Colorado; under the law of 1877; under the law of 1885, the city having given the required consent; and under the general incorporation laws of the state.

In view of the length of their brief, counsel kindly furnished the court an "outline of the briefs."   In it I find this in capital letters:   "Whether self-executing or not, the constitution, supplemented by the statutes and consent of the city, conferred upon all persons obtaining such consent the right to construct telephone poles and wires upon all of the public highways of the state, including streets and alleys of the consenting city; and when the right thus conferred was accepted by the actual construction of a plant, the constitution and statutes operated to grant a perpetual and irrevocable right to maintain and operate the telephone plant thus constructed."

And again:   "The construction at some time in the past, with the consent of the municipality, having been thus admitted by the complaint, it follows that the Act of 1885 and the Act of 1907 have constituted and still constitute a continuing grant to the person in possession of said constructed telephone plant within the municipality of the right to operate and maintain it."   The only claim of right to use the streets, which the plaintiff in error made at the trial or in the briefs on file here, is that arising from a perpetual franchise.

No attempt was made to show any other right until, on the second oral argument, counsel suggested that certain ordinances of the city passed since the transcript was filed in this court, should be treated as a recognition of defendant's right to use the streets. The various acts of the city which the majority opinion holds to have given the defendant a revocable license were pleaded, and treated in the briefs, as evidence of the city's recognition of an existing franchise, a right perpetually to occupy the streets.

To reverse the judgment on this record, and under such circumstances, is to violate the settled rules of practice, and establish a precedent which is likely to be productive of evil. I, therefore, feel impelled to record my dissent.

I am unable to agree with the conclusion announced that a majority of the five judges of the Supreme Court, that is to say three of them, may determine a case required to be presented to the court *en banc*. The question is not, in my opinion, to be determined by precedents of other courts, because of the peculiar provisions of our constitution.

This court is authorized to sit in departments consisting of three members, all of whom must agree upon a decision rendered by a department. The constitution requires that certain cases be determined by the court *en banc*. According to the rule laid down in the majority opinion, three judges may, if sitting *en banc* as a part of a quorum, which might be only four members, determine a constitutional question, the very authority which has been denied to them by the constitutional provision creating the departments. If the members of a quorum consisting of four judges be equally divided in opinion, the judgment under review is affirmed under section 403 of the code. These two judges may determine a constitutional question, which three judges may not constitutionally consider, if sitting in department.

I do not think that this court may, by its ruling, make nugatory a constitutional provision by a mere making of

the tribunal a court *en banc,* instead of a court in department.

Scott, J., dissenting:

This case was submitted and argued *en banc.*

The constitution provides that the court shall consist of seven judges. By the term "Court *en banc*" is meant the whole court as constituted. The decision purporting to reverse the judgment is but by three members of the court in agreement with it. It is therefore by a minority of the court as constituted.

The proposition is so unexampled, so shocking, and to my mind, so wholly opposed to the letter and spirit of the constitution and statutes, that I am compelled to regard it as a repudiation of the organic law and the statutes enacted under it, and fraught with the gravest dangers to constitutional government.

1. It may be stated as a universal rule of law, that the question as to the number of judges required to be present and necessary to authorize the legal transaction of business by a court is to be determined from the constitutional or statutory provisions creating and regulating the courts. And, further, that in the absence of a quorum of the number of judges required by law to hold court, a judgment rendered by the remaining judges would be regarded as a nullity, because in such case there would be no authority in the court to render the judgment.  7 R. C. L. 998.

In the absence of constitutional or statutory provision on the subject, a majority of the court would constitute a quorum. Our constitution and statutes are silent upon the subject as to what number of judges shall constitute a quorum.

2. Section 1523 Mills Statutes, 1912, provides: "If there shall not be a quorum of the justices of the Supreme Court present on the first day of any term, the court shall be and stand adjourned from day to day until a quorum shall attend; and said court may, there being a quorum present, adjourn to any day specified, as may be deemed advisable."

It will be seen that by this statute less than four judges are prohibited from holding court. They are even prohibited from adjourning the court without a quorum. And yet it is held in this case that three of the judges may pronounce a judgment of the court *en banc,* reversing *nisi prius* decision.

3.   There are further limitations placed on the number of judges required to agree to the pronouncement of judgments by the Supreme Court. By section 2127, Mills Statutes, 1912, it is provided: "No punishment shall be inflicted in any case brought before the Supreme Court under the provisions of this chapter, unless a majority of the justices of said court concur in respect to such punishment."

4.   Article VI, sec. 5, of the constitution of Colorado provides: "The Supreme Court shall consist of seven judges, who may sit *en banc* or in two or more departments as the court may, from time to time, determine. In case said court shall sit in departments each of said departments shall have the full power and authority of said court in the determination of causes, the issuing of writs and the exercise of all powers authorized by this constitution, or provided by law, subject to the general control of the court sitting *en banc,* and such rules and regulations as the court may make but no decision of any department shall become the judgment of the court unless concurred in by at least three judges, and no case involving a construction of the constitution of the state or of the United States, shall be decided except by the court *en banc.*"

It will be here seen that a department of the court is expressly prohibited from rendering any decision involving a construction of the constitution of the state or the United States. It will not be contended that a decision of the case at bar does not involve a construction of the state constitution.

By this provision the court may consist of two, or, because of the limited number of judges, not more than three departments. If of two departments, then of four

judges each.   Still a department is expressly prohibited from considering, to say nothing of determining, any case involving a construction of the constitution.   If a department consisting of four judges may not even consider such a question, by what process of reasoning can we say that if three judges are sitting *en banc*, they may determine such a cause?   Can it be said that in the enactment of their organic law, the people even intended such an absurdity?

Under the present organization of the court three members constitute a department with power to determine all questions of less importance than a construction of the constitution, yet this may not be done in any case without the concurrence of all the judges constituting the department.

If it was the intent and purpose of the makers of the constitution to permit three judges of the court to determine a constitutional question while sitting *en banc*, why is there such express prohibition of three judges sitting in department considering the question at all?

The conclusion of the majority would be precisely the same if our court consisted of nine judges, instead of seven. Five would constitute a quorum and three would be a majority of the quorum, and therefore the three of the nine judges would have the power to determine a constitutional question, while if the same three were sitting in department they are expressly denied the right to consider the question at all.   Not only this, but the three who have assumed to construe the organic law in this case are at the same time denied the power to even open or adjourn court *en banc*.   To my mind this not only trifles with the constitution but defies the plain import and purpose of that charter of the people's rights.

It is said, that a majority of the court constitute a quorum, and therefore that a majority of this quorum may determine a cause.   There is no suggestion in either the constitution or statutes that supports such a conclusion.

But the very spirit of the contention is negatived by the provision of our constitution as relates to legislative acts.

A majority or a quorum of either house of the legislature may sit and transact business, but it is provided by sec. 22 of Article V of the constitution that "no bill shall become a law except by a vote of a majority of all the members elected to each house." Not only a majority present are necessary, but a majority of those elected.

Can it be assumed that the makers of the constitution ever contemplated that less than a majority of their highest court should construe the provisions of that instrument. The people of this state have shown great concern in the matter of court construction of their constitution. They have not only denied this power to a department of this court, but by another constitutional amendment, they have likewise denied such power to the District Court, a constitutional court of original and general jurisdiction, even in the first instance, a power which had theretofore been universally exercised.

5. Section 438 of the Civil Code also provides: "Whenever the Supreme Court shall be equally divided in opinion, on hearing an appeal or writ of error, the judgment of the court below shall stand affirmed."

Here is an express provision of the law which may not be overlooked. This provides that when the *court* shall be equally divided, the judgment of the lower court must be affirmed. This provision was applicable and enacted when the court consisted of three judges. It is equally applicable now when the court consists of seven judges. Both then and now the court consisted of an odd number of judges, and hence the court could not then and cannot now, be equally divided in opinion if all judges participate.

It can have no other meaning than that one-half of the largest even number of judges which may sit, one-half of six, to-wit, three, cannot reverse a decision of the lower court, and that in such case and where six judges sit, the judgment stands affirmed by operation of the statute alone.

Hence, if there were six judges sitting in the present case, three have not the power to affirm or reverse the judgment. The judgment is affirmed by operation of law alone.

It cannot be reversed by the votes of three judges. This for the reason that the constituted court nor a majority thereof has not voted for a decision, and therefore it has failed of a court decision, and there can be no decision in such a case except the decision of the law as provided by the statute.

So in this case, if one additional judge had participated, and had joined the two others in dissent from the proposed majority opinion, then and in that case the decision of the lower court must have been affirmed.

Thus by one additional dissent, and with no more than the three voting in the affirmative, the decision would have been changed from reversal to affirmance. · The logic of the majority, then, is that with the two judges only dissenting, the judgment may be reversed, whereas, if three had dissented, the judgment must be affirmed. This presents a strange anomaly in judicial logic. When we reflect that not less than three judges in agreement can pronounce a decision, and then only in department, and this by the express mandate of the constitution, the unsoundness of the proposition that three judges sitting *en banc* may pronounce a decision, without any authority under the constitution of statutes, become apparent.

6. Our first constitutional convention submitted as a part of the proposed constitution the following, being adopted as section 5 of Article VI: "The Supreme Court shall consist of three judges a majority of whom shall be necessary to form a quorum, or *pronounce a decision.*" Thus by express constitutional mandate a majority of the court was required to pronounce a decision. This remained a part of the fundamental law until the amendment of 1903, increasing the number of judges, it being omitted from the draft. It cannot be assumed that it was the purpose of the omission to change this fundamental policy, and to intend that a minority of the judges should pronounce a judgment of the court sitting *en banc*, else the amendment would have been so declared. The only reasonable assumption is that this question was deemed to be otherwise suffi-

ciently covered in the draft. To hold that it was the purpose to so revolutionize the law upon this grave subject, without even a suggestion concerning it, is to insult the intelligence of the general assembly submitting the amendment.

But the majority finding no authority under the constitution or statutes of this state, in support of their astounding conclusion, cite authorities from other states upon which they seek to rely.

7. The case of *Commonwealth v. Mathues*, 210 Pa. 372, 59 Atl. 961. This case was in review of an action in mandamus to compel the State Treasurer to pay salaries of judges fixed by the legislature, including judges of the Supreme Court.

The court consisted of seven judges. All but one was financially interested in the result. The one judge assumed to and did pronounce the decision of the court. He cites no authority for his unprecedented and arbitrary act. He does not even refer to the constitution or statutes of his state, from which he must have derived his authority, if he had any. It is a fitting case to cite in support of the remarkable action of this court in this case. It finds no support in the constitution or statutes of Pennsylvania, nor in common sense. The action of the single judge in assuming to render a decision for a court composed of seven judges is so unreasonable as to make it stand out in our jurisprudence as a monstrosity. Indeed it must be said that in the history of judicial decisions, it partakes of the characteristics of the Irishman's mule, in that it can have no pride of ancestry, nor hope of posterity.

8. In the case of *State v. Lane*, 26 N. C. 434, cited in the majority opinion, the Supreme Court of that State consisted of three judges. One of these had died, and the remaining two determined the cause. It was contended that a majority of the judges were without power to so hear and determine. This contention was denied and it was held that a majority of the court could pronounce a decision. It was there said: "Therefore, when the statute is silent

as to what number of the judges shall unite in the judgment, a majority may give it; and, in like manner, when it is silent as to the number of judges who shall unite in consultation, a majority must suffice."

This is precisely my view in this case, that is to say, when the Supreme Court sits *en banc*, it requires a majority of the judges of the court in agreement, to pronounce a decision.

9. The majority cite *Oakley v. Aspinwall*, 3 N. Y. 547, as in support of their position. The Court of Appeals of New York, by constitutional provision, consisted of eight judges. In the case considered, seven of such judges participated. Five of these, or a majority of the entire court voted for reversal, of a cause pending while two of the seven judges dissented. At the commencement of the hearing, one of the five judges so afterward voting for reversal, suggested that he was related in a remote degree to one of the parties, and offered to leave the bench. All parties to the action objected to this and urged him to participate in the decision, which he did. Subsequently, the defendant in error filed a motion to set aside the judgment of reversal upon the ground that the one judge was disqualified to sit because of his kinship to one of the parties, such judge having voted as one of the five judges. That motion was heard by the remaining six judges.

The majority opinion upon this motion severely criticises counsel for their conduct in consenting and urging the judge to sit, and afterward presenting the motion to set aside the judgment, because of his participation in the judgment, adverse to them. This motion to grant a rehearing, however, was sustained, the court holding that the disqualification could not be waived, by a vote of four to two of the judges of the six judges participating.

It is plain that the motion for a rehearing was based solely upon the disqualification of the judge who was one of the five constituting the majority of the court who voted for a reversal of the case in the first instance, and the inference is clear that the motion was based upon the fact

that with the elimination of the disqualified judge, there were but four judges remaining who had voted for the decision, or less than a majority of the court as constituted.

It is true that but four of the judges voted to sustain the motion for a rehearing, but this was a matter of procedure, and not a final judgment or decree of the court. And it is also plain that this was done under a statute of the state declaring that six members of the court should constitute a quorum. Our constitution and statutes are silent upon the question of the number of the judges that shall constitute a quorum of the Supreme Court.

Nowhere in any of the several opinions written in that case is it even hinted that less than a majority of the judges of that court may pronounce a judgment of the court in any cause pending.

10. The other case cited by the majority is what is known as the Telephone Cases, occupying Vol. 126, U. S. Supreme Court Reports, 126 U. S., 31 L. Ed. 863, 8 Sup. Ct. 778. Nowhere in these cases is the question we are considering suggested or determined. We have before us the simple facts only, that the Supreme Court of the United States consists of nine judges. Two did not participate. Four joined in the majority opinion, and three joined in the dissenting opinion. So that the prevailing opinion had the support of but four judges of the court, which is not a majority of the nine justices. Why this opinion was permitted to become the opinion of the court must remain to us purely a matter of conjecture, for the matter was not discussed in that case, and so far as I know, in any other. But as said in the beginning, the question of how many judges of a court may transact business or pronounce judgment is controlled by the particular constitution and statutes.

The constitution and statutes of the United States are very different from those of the State of Colorado in this respect. The number of judges which shall constitute the Supreme Court of the United States is not controlled by the Federal constitution. It is a matter wholly with Con-

gress, as are all other matters of organization and control, not left to the court itself. At the time the telephone cases were decided, there was a Federal statute which provided that six of the nine members should constitute a quorum, sec. 573, Rev. Stats. 1878. It may have been that either by act of Congress directly, or by permitted rule of the Supreme Court at that time, a majority of the statutory quorum was authorized to pronounce a judgment. In any event it was a question of statutory power. The decision throws no light one way or the other upon the question here.

It is plain that no respectable authority cited supports or tends to support the conclusion of the majority.

11.   But that conclusion is based upon the mistaken assumption that the two non-participating judges are disqualified to participate in the case.

It is true that Mr. Justice Denison heard and determined the case in the lower court, but this is not a disqualification under our law. It must be assumed that he would not have heard the case below if he had in any sense been disqualified.

Why Mr. Justice Allen declines to participate I am not advised, but I know of no disqualification.

It is natural and proper that a judge who has presided at a *nisi prius* trial should be reluctant to participate in the hearing on review, and does not do so as a rule where there is a sufficient number of judges otherwise, to pronounce an opinion and justice may be done.

12.   In the case of *D. C. I. & W. Co. v. Middaugh,* 12 Colo. 434, 21 Pac. 565, 13 Am. St. 234, it was said by Mr. Justice Elliott: "Having presided at the trial of this case in the District Court, it has been with great reluctance that I have consented to participate in the review of it in this court. But the circumstances attending the case in this court have been peculiar. The honorable commissioners first considered the case and reported a unanimous opinion affirming the judgment, though upon grounds somewhat different than those announced in this opinion. Upon my

accession to the bench, finding the judges divided in opinion in respect to the case, I waited for my Brother Hayt to qualify, hoping he and Chief Justice Helm would be able to decide the case without my intervention. But after patient consideration, they, being unable to agree, have insisted that it is my duty to sit in the case, else the decision might be deferred to the close of my term." It will be noticed that it was the view of the entire court that he should so participate in that case.

See also *Edwards et al. v. D. & R. G. R. Co.*, 13 Colo. 59, 21 Pac. 1011; *Bank v. Hummel*, 14 Colo. 276, 23 Pac. 986, 8 L. R. A. 788; *McClure v. Smith*, 14 Colo. 297, 23 Pac. 786; *Boettcher v. Colo. Nat. Bank*, 15 Colo. 23, 24 Pac. 582.

13. In the case of *O'Connor v. Smithers*, 45 Colo. 23, 99 Pac. 46, the facts as stated by the court were: "When these cases were presented to this court they were heard by four of the justices. Justices Helm, Goddard and Maxwell did not participate in the first instance, because they are candidates to be voted for at the next election. The four justices were unable to agree and no order was then made. Later, application was made by the petitioner, to have the cases heard before the full court, and orders were at that time entered, the purpose of which was to preserve the *status quo'* until the cases could be finally disposed of. On the hearing before the full court, respondents objected to Justices Helm, Goddard and Maxwell participating because of the fact that they were candidates on the tickets in question." It will be noted that a majority of the court sat in the first instance, just as in this case, that they were divided in opinion as in this case. The four judges sitting could have been divided in but one of two ways, either one to three, or equally. If they were divided in the proportion of one to three, then there was presented the identical situation as here, that is to say, three judges of the same mind, and therefore, if the position of the majority here is sound, the three judges could and should have rendered judgment. If they were equally divided in opinion and if, as the majority here say, a majority of a quorum have the power

of decision, then the court must have followed the statute in case of equal division and have declared the case to be affirmed under the statute.

Nothing is plainer than that the entire membership of the court repudiated such a doctrine and the three judges who declined to participate in the first instance, were called in and participated over the objection of counsel.

It is plain that it was a case wherein much adverse comment would and naturally did arise by reason of the three judges being candidates and at least publicly believed to be interested.

Such participation was necessarily very embarassing to the three distinguished jurists even if it was strictly within the law, and we must assume that they would not have joined in the pronouncement of a decision if they could have believed and held with the majority, in this case, that a majority of a quorum, and not a majority of the court could pronounce a judgment of reversal.

It is apparent that in effect and in fact, though not in language declarative, the acts and proceedings in that case are an authority and should be controlling in this case upon the question I am considering.

14.   But I am unable to see the consistency of action of the non-participating judges in declining to participate in the cause here pending before the court, and at the same time participating to the extent of adopting a rule in the same case, whereby the opinion of a minority of the court should have the same force and effect as if concurred in by a majority of the court.

Admittedly the opinion of the three must have been inoperative and void except as it may be said to be validated by the votes of these two judges, or at least one of them to hand it down as an opinion of the court. If it was a binding decision of the court, why did it require the votes of these two judges to pronounce it? If they had not so participated and voted, it could not have emerged as a judicial decision and would not now be entered as such.

Therefore, in my opinion, their participation in adopting the rule to make it effective was as vital and necessary as if they had joined in the opinion of the three judges. It appears to me that this attitude creates a distinction without a difference, a distinction to my mind as reasonable as if A charged with the murder of B, by pushing him over a cliff, whereupon he fell to the bottom of the abyss and was killed, and then to defend on the ground that he simply pushed B over the cliff, but that his fall and consequent death were caused by the natural law of gravitation.

With due deference to the judgment of my learned colleagues, I am forced to the irresistible conclusion that the action of the majority in this particular, constitutes in effect, a judicial usurpation of constitutional and legislative power, creating within the range of its possibilities grave danger to constituted government.

### *On Motion for Rehearing.*

Garrigues, C. J.

(1) It is assumed in the argument on rehearing that the opinion gives the company a perpetual franchise. Also, that, as a condition precedent to terminating the license, the city would have to relinquish its right to regulate rates. Neither assumption is correct, and the opinion does not so hold. The opinion does not give the company a franchise, perpetual or otherwise.

(2) Regarding the power of the majority of a quorum of the court handing down an opinion, the Supreme Court of the United States, in *United States of America v. United States Steel Co.,* 251 U. S. 417, 40 Sup. Ct. 293, 64 L. Ed., on the same day exercised like power by handing down an opinion only concurred in by a majority of a quorum of the court. The full bench consisted of nine judges, two were absent, seven were present constituting a quorum. Of the seven, three dissented and four concurred in the opinion.

*Rehearing Denied.*

As to the first proposition Mr. Justice Allen and Mr. Justice Denison do not participate.

Decided March 1, A. D. 1920.    Rehearing denied June 7, A. D. 1920.